858 So.2d 697 (2003)
Albert J. AVENAL, Jr., et al.
v.
STATE of Louisiana, DEPARTMENT OF NATURAL RESOURCES.
No. 2001-CA-0843.
Court of Appeal of Louisiana, Fourth Circuit.
October 15, 2003.
Rehearing Denied November 21, 2003.
*699 Philip F. Cossich, Jr., Cossich Martin Sumich & Parsiola, Belle Chasse, LA, Les Martin, New Orleans, LA, Michael X. St. *700 Martin, Timothy C. Ellender, Jr., St. Martin & Williams, Houma, LA, Wendell H. Gauthier, Scott Labarre, Gauthier, Downing, Labarre, Beiser & Dean, Metairie, LA, Carolyn McNabb, Carolyn McNabb & Associates, Houma, LA, for Plaintiffs/Appellants.
Richard P. Ieyoub, Attorney General, Andrew C. Wilson, Donna M. Young, David L. Carrigee, Jedd S. Malish, Special Assistant Attorneys General, Burke & Mayer, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE and Judge MAX N. TOBIAS Jr.).
JOAN BERNARD ARMSTRONG, Judge.
This is a class action by oyster fishermen who contend that their leases were taken, in a constitutional sense, by the State of Louisiana Department of Natural Resources. Following a jury trial, the trial court rendered judgment in favor of the plaintiffs. The State appeals. For the reasons given below, we will modify the quantum of damages awarded as to one of the plaintiffs but otherwise affirm.
The alleged taking occurred as a result of the operation of the Caernarvon Freshwater Diversion Structure (the "CFDS") as a coastal restoration measure. The ecology of the areas where the plaintiffs' oyster leases were located was altered as a result of the freshwater diversion so as to make those areas no longer suitable for oyster production.[1]
Historically, the Breton Sound Basin, where the plaintiffs' oyster leases were located, contains a mixing of freshwater from the Mississippi River and other freshwater sources with saltwater from the Gulf of Mexico. As a result, much of [the area had water of intermediate salinity. In particular, much of the area had an intermediate salinity level that is suitable for oysters. Stated in a simplified manner: The area closest to land, and thus closest to the sources of freshwater, had the lowest salinity and was not sufficiently saline for oysters. The area farthest from land, and thus closest to the Gulf of Mexico, had the highest salinity and was too saline for oysters. In between those two areas was the area of intermediate salinity that was suitable for oysters. Over time, the construction of flood-control levees on the Mississippi River reduced the flow of freshwater into Breton Sound. That reduction of freshwater flow, along with other man-made and natural changes, caused the area of intermediate salinity, suitable for oysters, to move landward. The area of higher salinity, which was not suitable for oysters, also moved landward. The reduction of the flow of freshwater and the landward movement of the area of higher salinity caused coastal erosion and loss of coastal wetlands.
The State, with assistance from the federal government, has undertaken a program of coastal restoration. With respect to Breton Sound, the coastal restoration effort requires the diversion of additional freshwater from the Mississippi River to Breton Sound. This diversion is done by means of the CFDS. This increased flow of freshwater moved the intermediate salinity area, which is suitable of oysters, outward away from the land. Areas closer to the land, which had previously had intermediate salinity, and which had been suitable *701 for oysters, became areas of lower salinity which were no longer suitable for oysters. The area of higher salinity, which is not suitable for oysters, was moved farther from land. In sum, as a result of CFDS, some areas which had previously not been suitable for oysters became suitable for oysters and some areas which had been suitable for oysters were no longer suitable for oysters. The plaintiffs' oyster leases were in areas which were no longer suitable for oysters.[2]
The CFDS is a success, and has halted coastal erosion and fostered coastal restoration. However, one of the costs of these laudable achievements is that the plaintiffs' oyster leases are no longer productive to a commercially feasible extent. Variations in the flow of freshwater through CFDS, particularly reductions of the flow of freshwater, can sometimes allow temporary, sporadic production of oysters on the plaintiffs' leases. However, assuming that CFDS will be used as intended, and there is no reason to doubt that it will be, and assuming that CFDS produces the results planned, and in fact it is doing so, the plaintiffs' oyster leases can no longer be used for commercial oyster production.
The first issue raised on appeal by the State is the quantum of damages. The water bottoms are owned by the State and leased to the plaintiffs. The plaintiffs presented damages evidence, which was accepted by the trial court, based upon the cost that would be required to "restore" (or, more accurately, recreate in another location) suitable conditions of the water bottoms of the plaintiffs' oyster leases.
More specifically, oyster leases, to be productive, must have water bottoms covered with "cultch", which is hard material such as crushed shells, gravel, etc. laid down over the mud or sand of the water bottom. The trial court awarded damages using a formula (referred to as the "cultch currency matrix") as to the cost (installed) of cultch on a per acre basis which cost it multiplied by the number of acres covered by the plaintiffs' oyster leases. In particular, the trial court awarded damages of $21,345 per acre.
The cultch currency matrix was developed by the State, Department of Natural Resources ("DNR"), in cooperation with various private groups (oyster fishermen, the oil & gas industry, environmental organizations, etc.), state and federal agencies (Department of Wildlife and Fisheries, Army Corps of Engineers, etc.) and biologists and other scientists with interests in coastal areas containing oyster leases. The State, DNR brought representatives of all of these various interests together at an Oyster Lease Valuation Matrix Workshop in March, 1995. The list of attendees at the Workshop includes a number of the expert witnesses who testified for each side below as well as the State's trial counsel below. Thus, the State was well-represented at the Workshop from a scientific, technical and even legal standpoint.
The minutes of the Workshop reflect that numerous issues and proposals were discussed covering scientific/technical, economic/financial and other topics. There were some issues and proposals as to *702 which the various interests represented at the Workshop were unable to agree. However, consensus developed on sufficient issues and proposals that the Workshop was able to produce the cultch currency matrix as a consensus means of valuing damages to oyster leases. The State, DNR, adopted the matrix with minor modifications.
The matrix uses the cost of cultch (installed) as the "currency" for valuing oyster leases. The layer of cultch placed on the water bottom is necessary for the growth of oysters. The cultch currency matrix looks to the cost of the cultch (installed) on a per-acre basis as the measure of value of the oyster lease. Thus, in the present case, the cultch currency matrix measures the value of the plaintiffs' leases by the cost of replacing them at another location by the placement of the necessary cultch. (Interestingly, in another coastal area affected by the State's coastal restoration efforts, Davis Pond, the State has compensated or will compensate oyster lessees based upon the cost of installed cultch which, as stated above, is the determinative factor in the cultch currency matrix.)
The State's principal objection to the use of the cultch currency matrix is that the matrix measures replacement value, rather than market value, and that the plaintiffs should be compensated based upon market value of their oyster leases as of the date they were taken by the State. After most careful consideration of the State's arguments and citations to legal authorities, we disagree with the State's contention for two general reasons.
First, the Louisiana Constitution, at Article I, Section 4, mandates that when private property is taken for public purposes, the private property owner "has the right to a trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss." (emphasis added). Under this provision of the Louisiana Constitution, an owner of property taken by the State has rights to compensation which go beyond the rights to compensation provided by the Constitution of the United States and by other state constitutions. State v. 1971 Green GMC Van, 354 So.2d 479 (La.1977); State v. Spooner, 520 So.2d 336 (La.1988); Jenkins, The Declaration of Rights, 21 Loy. L.Rev. 9 (1975). Thus, we believe that the Louisiana constitutional imperative of "full" compensation favors replacement cost, when that is greater than market value, as the measure of compensation to be applied. We note that, on some occasions when private property used for business purposes has been taken by the State, the Supreme Court has held that replacement cost, rather than market value, should be used as the measure of compensation to the private property owner. See State, Through Dept. of Highways v. Constant, 369 So.2d 699 (La.1979); State, Dept. of Transp. and Development v. Dietrich, 555 So.2d 1355 (La.1990).[3]
We also note that the Louisiana Constitution, as quoted above, specifically guarantees the right to trial by jury to determine compensation for the taking of private property for public purposes, and this makes us all the more cautious about *703 upsetting the jury's determination of the amount of compensation in this case. The State presented evidence as to the market value of the plaintiffs' oyster leases, including most particularly the expert testimony of economist Walter Keithly, but the jury was obviously unpersuaded by the State's evidence as to value. It is well-established in takings cases both that the jury as the trier of fact is afforded much discretion and that the jury's factual determinations (including its evaluation of expert testimony) may be disturbed on appeal only if they are clearly wrong-manifestly erroneous. See, e.g., State Through Dept. of Transp. and Development v. Estate of Davis, 572 So.2d 39 (La.1990); State, Dept. of Transp. and Development v. Pipes, 489 So.2d 293 (La.App. 4th Cir.), writ denied, 492 So.2d 1219 (La.1986). Based upon the constitutional protection of the jury's determination, as well as the just-cited caselaw, we cannot say that the jury clearly erred in selecting the replacement cost as the measure of compensation in this case.
Our second general reason for disagreeing with the State's contention that market value should be used to determine compensation, rather than the replacement value of the plaintiffs' leases as determined by use of the cultch currency matrix, lies in policy considerations of consistency of treatment in the determination of compensation for the taking of oyster leases. The State sponsored the creation of the cultch currency matrix as a means of determining the amount of compensation for the effective loss of oyster leases by man-made impacts. The State, DNR adopted the cultch currency matrix for use by the quasi-governmental Oyster Lease Damage Evaluation Board and that body makes determinations of compensation to oyster fisherman using the matrix. The State, DNR was the lead author of the cultch currency matrix. We note that the State has applied the cultch currency matrix in other situations. Therefore, we believe that the cultch currency matrix appears to be the best means available to best achieve consistent compensation for the taking of oyster leases. Accordingly, we find that it was appropriate and consistent to apply the cultch currency matrix in the present case.[4]
The State's next argument on appeal is that the plaintiffs did not prove that CFDS was the proximate cause of oyster mortality on the plaintiffs' oyster leases. In particular, the State argues that there are multiple sources of freshwater in Breton Sound and that these sources of freshwater also killed oysters. Also, the State argues that, even after CFDS came on line, there have been oysters produced in Breton Sound.
However, the testimony of the various expert witnesses (both the plaintiffs expert witnesses and the State's own expert witnesses), as well as the plaintiffs' own testimony as to their actual historical experience with oyster leases in Breton Sound, shows that the permanent loss of oyster productivity is attributable to CFDS. Although oyster mortality can be caused by a "freshet," a sudden large infusion of freshwater caused by heavy rains, the oyster mortality so caused is transitory and followed *704 by renewed oyster growth. Also, although the evidence shows that there was some oyster production in Breton Sound after CFDS came on line, it appears that this was sporadic oyster growth that occurred when the flow of freshwater through CFDS was temporarily reduced. However, this sporadic oyster growth was not sufficient to make the plaintiffs' oyster leases commercially viable. Moreover, it is apparent that, when CFDS is used at its planned capacity, and there is no reason to doubt that it will be, as opposed to the curtailed flow which allowed sporadic oyster production, the plaintiffs' oyster leases are rendered unsuitable for oysters.
Lastly on this "proximate cause" point, the State argues that the plaintiffs have not proven with specificity the amount of production from their leases prior to CFDS coming on line. However, so long as the plaintiffs proved generally that their leases were productive before CFDS came on line, and that they were not productive after CFDS came on line, and that CFDS caused the loss of oyster productivity, proximate cause has been proven.
The State next argues that the plaintiff class was improperly certified. However, this court's prior upholding of the class certification became final when the Supreme Court denied the State's writ application in Avenal v. State, Dept. of Natural Resources, 97-2747 (La.1/16/98), 706 So.2d 979. Thus, we cannot address this issue further.
The State's next argument on appeal is that the trial court erred by excluding from evidence certain proposed expert testimony for the State which was based upon the use of side scan sonar. The Louisiana Supreme Court, in State v. Foret, 628 So.2d 1116 (La.1993), adopted the United States Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as to the admissibility of scientific expert testimony. The trial court must apply a multifactor test to make a preliminary determination of the reliability of the proposed expert testimony. If the trial court determines that the proposed expert testimony lacks the requisite indicia of reliability, then the expert testimony is to be excluded. An evidentiary hearing, out of the presence of the jury, can be useful to the trial court's determination and that procedure was utilized in the present case. The two State proposed expert witnesses both testified as to their side scan sonar technique as applied to the plaintiffs' oyster leases.
The trial court's decision as to whether to admit or exclude from evidence the proposed expert testimony is reviewed on appeal using an abuse of discretion standard of review. Collins v. State, ex rel. Louisiana Health Care Authority, 99-2307 (La.App. 4 Cir. 7/12/00), 774 So.2d 167, writ denied, 2000-2633 (La.11/17/00), 775 So.2d 439; Mitchell v. Uniroyal Goodrich Tire Co., 95-0403 (La.App. 4 Cir. 12/28/95), 666 So.2d 727, writ denied, 96-0260 (La.3/15/96), 669 So.2d 421. The testimony at the Foret/Daubert hearing showed that, while the use of side scan sonar itself is well-established, the application of that technology to the determination of what portion of any oyster lease water bottom is covered by cultch is still very much a work-in-progress. Indeed, the State's experts were experimenting with the technique in the course of their work for the present case. The specific type of study undertaken in the present case has been done seldom, if ever, before. The specific technique employed has not been the subject of peer-reviewed publication. There is no generally-recognized rate of error with the technique employed in the present case. This is not to say that *705 the State proffered "junk science", or that the State's experts were anything other than reputable scientists, but it is clear that the technique employed here is not mature scientifically. There was also evidence from "ground-truth", i.e., actually feeling the water bottoms with poles, that was at variance with the side scan sonar data. Under the circumstances, we cannot say that the trial court abused its discretion in excluding the side scan sonar evidence.
The State's next argument on appeal is that the trial court erred by not granting three of the State's challenges for cause to prospective jurors, thus causing the State to use three of its six peremptory challenges to exclude those three jurors. Even if the trial court erred as to those three challenges for cause (and we make no finding that the trial court did so err), we do not believe that such would be grounds for reversal. The trial court granted eight of the State's thirteen challenges for cause as to prospective jurors. A reason for allowing the parties peremptory challenges is that reasonable minds can differ as to whether a particular prospective juror should be excluded for cause and to mitigate any harm that might otherwise be caused by a trial court's erroneously failing to strike for cause a prospective juror. The fact that, after striking eight jurors for cause at the State's instance, the trial court failed to strike three others, so that the State had to use three of its six peremptory challenges, does not appear to us to be likely to have caused any substantial prejudice to the State. In any case, the trial court has discretion to manage the selection of the jury, e.g., Carter v. Baham, 95-2126 (La.App. 4 Cir. 10/9/96), 683 So.2d 299, and a review of the record of the jury selection as a whole does not reveal an abuse of discretion.
The State's next argument on appeal is that some of the plaintiffs' claims are prescribed under La. R.S. 9:5624 because that statute provides a two-year prescriptive period for claims for "damage" to private property for public purposes and the plaintiffs did not file suit until two and a half years after CFDS came on line. However, the statute relied upon by the State has no application to the present case. Specifically, La. R.S. 9:5624 applies only to cases in which private property has been "damaged" but not taken by the State. Greater Baton Rouge Airport Dist. v. Hays, 339 So.2d 431 (La. App. 1st Cir.1976). See also A.K. Roy, Inc. v. Board of Com'rs for Pontchartrain Levee Dist., 237 La. 541, 111 So.2d 765 (1959); Powell v. Department of Highways, 383 So.2d 425 (La.App. 4th Cir. 1980); Schneider v. Jefferson Parish, 216 So.2d 604 (La.App. 4th Cir.1969). Nor is there any doubt that this is a "takings" case under La. R.S. 13:5111 which has a three-year prescriptive period. In fact, two prior published decisions of this court have held that this is a takings case. See Avenal v. State, 99-0127 (La.App. 4 Cir. 03/3/99), 757 So.2d 1; Avenal v. State, Dept. of Natural Resources, 95-0836 (La. App. 4 Cir. 11/30/95), 668 So.2d 1150. Factually, the key point as to why this is a "takings" case is that the plaintiffs' oyster leases have, under the normal full-flow operation of CFDS necessary to achieve its purposes, been rendered commercially non-viable as oyster leases and, because CFDS will be operated at its normal full flow on a permanent basis, the loss of commercial viability of the plaintiffs' oyster leases is permanent. When property has been rendered permanently non-usable for its only purpose, that is a taking. The facts that the State did not physically enter onto the plaintiffs' oyster leases, and that the CFDS was not constructed on the plaintiffs' oyster leases, are of no moment.
*706 Nor is it of any significance that the plaintiffs continue to have the legal right to use the leased premises for oyster production. What is dispositive is that the State rendered the plaintiffs' oyster leases permanently useless for commercial oyster production.
The State next argues that one of the class representative plaintiffs, Fox Oyster Company, was improperly awarded damages for leases which it managed but did not own. However, this is a class action, and Fox Oyster Company is one of the five class representatives. While all of the damages awarded must go to the actual owners of the oyster leases, that does not prevent Fox Oyster Company (which, in fact, does itself own many leases in the affected area) from serving as a class representative. The trial court can insure that damages are paid only to actual oyster lease owners.
The State also argues that the jury erred in its determination of the number of acres of oyster leases owned by each of the class representatives. The parties disputed these facts and presented evidence as to them. We do not believe that the jury was clearly wrong/manifestly erroneous in this regard. Therefore, we may not disturb the jury's determination. See West Jefferson Levee Dist. v. Coast Quality Const. Corp., 93-1718 (La.5/23/94), 640 So.2d 1258; LeJeune v. Union Pacific R.R., 97-1843 (La.4/14/98), 712 So.2d 491; Lewis v. State, Through Dept. of Trans. Development, 94-2370 (La.4/21/95), 654 So.2d 311.
Lastly, the State argues that it is relieved of liability because the State inserted into the plaintiffs' oyster leases, when those leases were renewed, certain "indemnity clauses". The Supreme Court held in Jurisich v. Jenkins, 99-0076 (La.10/19/99), 749 So.2d 597, that such unilateral insertion by the State of onerous clauses in oyster leases is legally invalid. The State argues that the legislature amended the oyster lease statutes to allow the State to unilaterally insert onerous clauses upon the renewal of oyster leases. See 2000 La. Acts No. 107. However, without deciding whether that statute permits the indemnity clauses at issue, we note that the statutory amendment applies only to oyster leases renewed or extended after July 1, 1995. Id. The list of oyster leases offered by the State does not include leases dated after July 1, 1995. Therefore, the statutory amendment does not apply and, under the Supreme Court's Jurisich, decision the indemnity clauses at issue are invalid.
For the foregoing reasons, the judgment the trial court is modified as to plaintiff Avenal and is otherwise affirmed.
AFFIRMED AS MODIFIED.
BYRNES, C.J., concurs in the reasons assigned by MURRAY, J.
LOVE, J., respectfully concurs in part and dissents in part.
TOBIAS, J., dissents and assigns reasons.
MURRAY, J., concurs with reasons.
I write separately to further elaborate on the evidentiary support for the jury's damage award.
At trial, the plaintiffs introduced the testimony of two experts, Michael Voisin and Noel Brodtmann, Jr., who opined that the cultch currency matrix is the best method to calculate damages to an oyster lease.[1] Mr. Voisin, an oyster farming expert, *707 explained that the matrix was originally developed in March 1996 for the Oyster Lease Damage Evaluation Board ("OLDEB") as a uniform system of compensating oyster lease holders for damages to their lease due to mineral (oil and gas) activities. It values oyster leases by determining the cost to replace lost or damaged leases. It does so by placing a value on the lease that varies depending on the type of lease substrate (foundation), i.e., reef, shell, hard mud, or soft mud.
According to Mr. Voisin, the State has extended the use of the matrix to the freshwater diversion project context, applying it in the Davis Pond Relocation Program. The Davis Pond Program provides for the exchange, relocation, or purchase of oyster leases located within the Barataria Basin, which is the target area of the Davis Pond Freshwater Diversion Structure. See La. R.S. 56:432.1. For the Davis Pond Program, Mr. Voisin indicated that the matrix allows for 187 cubic yards of cultch per acre of existing cultch or about 1.5 to 1.375 inches of cultch spread evenly across an acre. Mr. Voisin further testified that 1.375 inches of cultch is enough to plant seed oysters, yet the oyster industry recommends 3 to 6 inches of cultch to support full oyster growth. He still further testified that cultch costs about $38 per cubic yard if it is placed on water bottoms in less than 6 feet of water; yet for deeper water bottoms, the cost is $50 per cubic yard.
Mr. Brodtmann, an environmental consultant specializing in oyster assessments, testified that he conducted field assessments of some of the plaintiffs' leases using a poling procedure. The poling procedure involved moving across a lease area in a boat and probing the water bottoms with a cane pole every 8 to 10 feet. Based on the poling procedure, he determined the substrata characteristics of the water bottoms of the leases and classified them as reef, firm mud, or soft mud.
Mr. Brodtmann also testified, like Mr. Voisin, that an oyster reef must be a minimum of 3 to 6 inches thick in order to support an oyster habitat. He estimated that to build a 3-inch reef on an acre requires 403 cubic yards of cultch and costs $10,676; whereas, to build a 6-inch reef on an acre requires 806 cubic yards of cultch and costs $21,345. The latter figure, based on building a 6-inch reef, was adopted by the jury. In answering the jury interrogatory asking "[w]hat amount will fairly and adequately compensate the Plaintiff ... for the damages to his leases per acre of lease damaged?," the jury answered $21,345.
Further support for the jury's award is found in the trial testimony of the Secretary of the Department of Natural Resources, Jack Caldwell. On cross-examination, Secretary Caldwell acknowledged that in seeking federal aid for the proposed Davis Pond Program he stated under oath at a February 1996 United States Congressional Committee Hearing that oyster leases in Plaquemines Parish were worth $7,000 an acre. He also acknowledged that in January 1999, he approved the OLDEB's adoption of the matrix as a uniform evaluation method using 403 cubic yards of cultch as the estimated amount needed to build a 3-inch reef on an acre of water bottom. That estimate corresponds with Mr. Brodtmann's testimony.
Although there was contradictory expert testimony introduced by the state disputing the appropriateness of using the cultch currency matrix to value the plaintiffs' damages and estimating the average value of an oyster lease in Plaquemines Parish *708 before Caernarvon went on-line at $200 per acre, the jury obviously found the plaintiffs' experts' testimony more credible. As the Louisiana Supreme Court has held, "[c]redibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error." Lasyone v. Kansas City Southern R.R., 2000-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693. I cannot say that the jury's resolution of the conflicting expert testimony presented at trial in this case was manifestly erroneous.
LOVE, J., respectfully concurs in part and dissents in part.
I respectfully concur in that part of the majority opinion finding that the Caenarvon project resulted in a taking of certain oyster leases. I believe that the flood of water released by that project was as much a taking of the affected aquatic areas as the analogous situation of having one's property paved over in a state highway project on land or having one's land flooded by the creation of a spillway. Had these waters been released on dry land there would have been no question of a taking. Consequently, the prescriptive period is three years and the affected oyster owners are entitled to compensation.
However, I respectfully dissent from those portions of the majority opinion calculating damages. Just as Judge Landrieu stated in his dissent in Inabnet v. Exxon Corp., 614 So.2d 336 (La.App. 4 Cir. 1993), the ramifications of the damages awarded by the trial court in the instant case "shock the conscience."
The Supreme Court reversed and remanded Inabnet in part (presumably influenced by Judge Landrieu's dissent), Inabnet v. Exxon Corp., 93-0681 (La.9/6/94), 642 So.2d 1243, 1256, stating, inter alia, that:
Because the parties may have been misled in this regard [the measure of damages] by previous intermediate court decisions, it is appropriate to remand the case to the district court for further evidence and for a decision on this issue. On remand, the court should consider not only the rental price of the lease, but also the money, time and effort expended by the lessee in developing the lease, the availability of comparable leases, and other relevant factors. [Emphasis added.]
Id.
The Supreme Court opinion in Inabnet stated that the measure of damages was "the value of plaintiff's leasehold interest before and after the dredging," which in terms of the instant case would mean the value before and after the fresh water diversion. Inabnet, 93-0681 (La.9/6/94), 642 So.2d 1243, 1256. In this type of situation, loss of value cannot mean replacement cost or restoration cost. As was pointed out in the Supreme Court decision in Inabnet, at p. 21, 642 So.2d at 1256, the oyster lessees have no "personal" reason for restoring the water bottoms to their original condition, i.e., nothing that could be likened to nonpecuniary damages under La. C.C. art.1998. Therefore, replacement or restoration cost is not the measure of damages.
Loss of profit is probably the fairest measure of damages. This is sufficient to satisfy the Constitutional mandate that the "owner shall be compensated to the full extent of his loss."
The oyster leases are investments. The only proper measure of damages is the economic loss suffered by the lessee and that would normally be the present value of the loss of future net income and the present value of the loss of future return *709 of capital suffered by the lessee. The time, money and effort expended by the lessee in developing the lease should be considered, but only to the extent they added value to the leasehold. The oyster lessees should not be able to recover any items of damage, which are not recognized as having economic value in the market place.
The plaintiffs rely on State Through Dept. of Highways v. Constant, 369 So.2d 699, in support of their contention that they are entitled to the restoration costs of the oyster leases. Constant does not support that argument. In Constant the issue was the expropriation of the loading and parking area of a marina. The Supreme Court in Constant found that the mere market value of the property expropriated did not make the owner economically whole because: "Without the replacement of their loading area, their marina business operations will be substantially destroyed." Id., at 702. In Constant the value of the expropriated land alone would not compensate the owner for the adverse economic effects of the loss of that land on his business, which the expropriated land serviced. The plaintiffs in this case have demonstrated no such collateral economic damage.
Just as the Supreme Court found in Inabnet, supra, the jurisprudence is still murky regarding the calculation of damages to oyster leases and this case should be remanded to the district court as was done in Inabnet, in order to apply the proper standard of damages.
A large number of the oyster leases contained indemnity provisions. Pursuant to a motion for summary judgment, the Department of Natural Resources asked the trial court to rule on the indemnity clauses. The trial court failed to do so. This Court previously ruled that the failure of the trial court to rule on the indemnity provisions was error. The trial court refused to grant a new trial on this issue. The Department of Natural Resources sought supervisory review of the trial court's action in this regard on March 16, 2001. 2001-C-0542. On May 22, 2001, this Court consolidated that writ with this appeal. This case should be remanded for a ruling by the trial court on each indemnity agreement pursuant to the previous order of this court.
It was also error for the trial court to exclude the State's side-scan sonar evidence. While this error alone might not warrant a remand, when coupled with the other errors discussed herein, this error only serves to reinforce the decision to remand.
For the forgoing reasons, I would affirm that portion of the trial court judgment finding that a taking had occurred, but I would remand for the admission of the State's side-scan sonar evidence and recalculation of the damage award.
TOBIAS, J., dissents and assigns reasons.
I respectfully dissent. In my view, the majority errs in its reading and interpretation of our earlier decisions in this case, addressing the issue of whether there was a "taking" by the State. Because I find that a "taking" as defined by our law and jurisprudence did not occur, I find that this case is prescribed. I would therefore not address the other assignments of error that go to the merits. My reasoning follows.
In this class action suit, the defendant, the State of Louisiana, through the Department of Natural Resources ("DNR"), appeals a trial court judgment rendered in favor of the plaintiffs, a group oyster fishermen holding oyster leases on water bottoms owned by the State in Plaquemines *710 and St. Bernard Parishes, awarding them damages for the "taking" of their leases as a result of the Caernarvon Freshwater Diversion Structure.[1] Plaintiff, Albert J. Avenal, Jr. ("Avenal"), also appeals from the judgment. In addition to Avenal, the other class representatives in the litigation are Clarence Duplessis ("Duplessis"), Kenneth Fox ("Fox"), Fox Oyster Company, and Nick Skansi ("Skansi").
Facts, History, and Evidence
The factual and procedural history of this case follows.[2]
In Louisiana, the diversion of fresh water from the Mississippi River has long been used for a variety of purposes, including the creation of new land, the prevention of coastal erosion, and the enhancement of oyster production. Historically, oyster fishermen in Louisiana have used freshwater diversions to allow river water laden with nutrients to flow into their oyster beds to reduce the salinity and thus render the water conditions unfavorable for saltwater predators such as black drum fish and oyster drills, as well as parasites and diseases.
Freshwater diversion became particularly important for the oyster industry after 1927 when the Mississippi River levee system was enhanced for navigation and flood prevention purposes. However, the construction of additional and larger levees prevented river water from reaching adjacent estuaries and the oyster beds located therein on both sides of the Mississippi River. Consequently, these areas continued to become more saline; the salinity killed the plant life that held the soil together. This, in turn, accelerated erosion, which was no longer being offset by the replenishing of land by suspended sediment from the river. As the land eroded, the saltwater intrusion from the Gulf of Mexico continued further inland. In response, the oyster fishermen relocated their oyster beds farther inland away from encroaching saltwater predators and disease, but closer to the sources of manmade pollution. To address the adverse environmental conditions in the Breton Sound[3] estuary within Plaquemines Parish, various structures and outlets were gradually constructed in the levee system along the east bank of the Mississippi River to allow river water to enter the Breton Sound estuary. In addition to the Bohemia Spillway south of Point-a-la-Hache in Plaquemines Parish, constructed in 1925, other freshwater diversion structures included Bayou LaMoque and White Ditch Siphon, constructed by the State of Louisiana in 1956 and 1964, respectively.
In 1965, the United States Congress passed the Flood Control Act, Pub.L. No. 89-298, 79 Stat. 1037 (1965), which authorized construction of freshwater diversion structures at Caernarvon, Louisiana, and *711 other locations in the Breton Basin. Thereafter, public hearings were held for several years involving various governmental agencies and oyster fishermen. In 1983, the Louisiana Department of Wildlife and Fisheries ("DWF"), which is part of the DNR, published a report setting forth optimal salinity regimes for oyster production on public seed grounds in the Breton Basin.
In 1984, the United States Army Corps of Engineers ("Corps") prepared an environmental impact statement suggesting locations of target salinity concentrations (isohalines) at three areas along the southeast Louisiana coast to enhance fisheries and to combat coastal erosion. To create optimal salinity regimes, the environmental impact statement proposed the construction of three freshwater diversion structures in the three areas: (1) the Bonnet Carre Spillway in the Lake Pontchartrain Basin; (2) the Davis Pond Freshwater Diversion Structure in the Barataria Basin; and, (3) the Caernarvon Freshwater Diversion Structure in the Breton Basin. The Caernarvon project, in particular, was designed to abate saltwater intrusion and marine tidal invasion, while promoting coastal restoration and enhancing fisheries and wildlife in the basin. The DNR and DWF set optimal target salinity zones in Breton Sound, which ranged from 5 parts per thousand ("ppt") for the northwest inland area of the basin to 15 ppt for the lower seaward end of the basin. The salinity zones were based upon the fact that below 5 ppt, oysters become stressed and die, while above 15 ppt, oysters are subject to saltwater predators and disease. The optimal salinity regime targeting annual average isohalines in concentration between 5 ppt and 15 ppt allowed oyster propagation and cultivation to continue in an existing zone within Breton Sound, while at the same time fostered coastal restoration by freshening the upper Breton Basin and allowing vegetation to return in an area where little active oyster production was occurring. Eventually the Caernarvon Interagency Advisory Committee ("CIAC") proposed a management plan for the Caernarvon Freshwater Diversion Structure using salinity zones as well as other environmental considerations.
In 1984, Plaquemines Parish hired Dr. Johannes Van Beek of Coastal Environments, Inc., to conduct a study to determine the potential effects of the proposed Caernarvon Freshwater Diversion Structure. Dr. Van Beek projected that, after Caernarvon went on-line, 35,000 acres of land near the structure would have salinities below 2 ppt, concluding the area would become freshwater marsh. Dr. Van Beek also projected that an additional 31,000 acres would have salinities between 2 ppt and 5 ppt and eventually develop into intermediate marsh.
In connection with public announcements, public hearings, and governmental environmental impact studies in the latter 1970's, the 1980's, and early 1990's, the Louisiana and federal governments informed the public, including the oyster industry, of the proposed freshening of the upper Breton Basin and the likelihood of adverse affects upon oyster leases located in areas that had been historically fresh prior to 1960. In a letter dated 26 October 1990 to Mr. Kell McInnis, Acting Secretary of the DWF, Bill Good, Ph.D., Acting Administrator of DNR's Coastal Restoration Division and Chairman of the CIAC, expressed concern that oyster leases within the Caernarvon structure's intended impact area might be adversely affected by the freshwater diversion flow. Thus, Dr. Good and the CIAC requested that the DWF allow the oyster leaseholders to relocate their oysters to areas outside the impact zone.
*712 In response, the DWF informed the CIAC by a memorandum dated 7 November 1990 that an oyster "relay" operation would take place under the direction of the DWF and Louisiana Department of Health and Hospitals ("DHH"). The memorandum stated, in part:
While the particulars of the [Caernarvon] diversion scheme are debatable, the need for controlled supplemental fresh water input to the area is not. Saltwater intrusion has claimed and continues to threaten vast acreage of fresh, brackish and intermediate marshes. The Department recognizes that the diversion plan would not eliminate swamp and marsh loss, but it would significantly reduce the rates of loss throughout the basin. The instability of salinity conditions which now exist in the area has contributed to the inconsistency of commercial and recreational fisheries production and has also magnified the effects of occasional floodwater and domestic pollution. As saltwater intrusion progressed, the zone of favorable salinities for oyster production moved landward and away from the vast, historically productive reefs and firm water bottoms. The proposed freshwater diversion would shift the zone of greatest productivity back to the greatly superior reef areas which are much less affected by floodwater and pollution.
The Department is aware that certain fisheries resources could be displaced, however, we firmly believe that the increase in overall productivity of the area, along with increased utilization of existing resources, will result in real benefits to the vast majority of interest.
In regards to assisting the state in any mitigative damages resulting from the operation of the structure, the Department is prepared to compensate oyster fishermen whose oyster leases are adversely affected by the operation of the structure, in five years, by the relocation of oyster leases out of the area on an acre for acre basis at that time. The lessee would have to document these damages to obtain a lease relocation. Any such relocations would be restricted to areas designated for leasing in the vicinity.
LDWF, along with DHH is allowing oyster lease holders, south of the Caernarvon Freshwater Diversion Structure out to the Tennessee Gas Pipeline (Double pipeline) an opportunity to relocate oysters which may be affected by the operation of the structure.
The relay, known as the Caernarvon Oyster Transfer, was conducted from 3 through 7 December 1990, and allowed oyster lessees with productive oyster leases, who obtained a relay permit and posted a $1,000.00 performance bond, to move their oysters from the potential Caernarvon impact area to pre-designated lease sites outside the impact zone. Some oyster lessees chose to participate in the transfer; others did not.
Several months prior to the Caernarvon Freshwater Diversion Structure going online, the Corps conducted several hydrologic computer simulations of the structure's proposed operation to determine the potential effects of the freshwater diversion on the salinity levels in the basin. Based on the simulations, Domingo J. Elquezabal, the Corps' Senior Project Manager for the Caernarvon structure, sent a letter on 19 June 1991 to Dr. Good, stating that, "a month long diversion of 5,000 cfs [cubic feet per second] would cause serious detrimental effects on the area fisheries, especially oysters."
Meanwhile, in February, March, and April of 1991, significant oyster mortality occurred in the Breton Basin as a result of *713 elevated temperatures and a freshet, a period of significant freshwater intrusion from heavy rains, the Mississippi River's overflow, and other freshwater sources around Breton Sound. By August of 1991, oyster mortality levels had reached 75% to 100% on many privately leased oyster beds within the Breton Sound estuary. Several oyster fishermen claimed that the mortality was a result of the Caernarvon freshwater diversion; however, at the time, the Caernarvon Freshwater Diversion Structure had not yet gone on-line. The following month, in September 1991, the Caernarvon Freshwater Diversion Structure went on-line and operated for the remainder of the year at a minimal flow due to the existing oyster mortality. Nonetheless, after the 1991 freshet, the oyster lessees never experienced the "bloom" or abundant oyster harvest that historically followed a freshet. Also, Hurricane Andrew hit the Louisiana coast in 1992 and adversely affected the oyster industry.
On 29 March 1994, the plaintiffs filed the instant suit in the Twenty-Fifth Judicial District Court for the Parish of Plaquemines on behalf of all persons holding oyster leases on state-owned water bottoms in Breton Sound, asserting that their oyster leases were destroyed or damaged because of the intrusion of fresh water from the Mississippi River by the Caernarvon Freshwater Diversion Structure. They asserted that the structure was authorized, constructed, funded, and operated by the State through the DNR. The plaintiffs further asserted that the State's action, i.e., the lowering of salinity levels of the water in Breton Sound below that necessary to support oyster cultivation, "has resulted in a permanent and substantial interference with plaintiffs' use and enjoyment of their land amounting to a taking of an interest in [their] property rights without compensation in violation of Article I,  4 of the Louisiana Constitution...."
On 24 April 1994, the plaintiffs also filed suit in the United States Court of Federal Claims against the Corps, which designed, financed, and built the Caernarvon Freshwater Diversion Structure. In that suit, the plaintiffs alleged a "taking" under the Fifth Amendment to the United States Constitution and sought class certification.
In the federal suit, the Corps moved for summary judgment, which the Court of Federal Claims granted in August of 1995, concluding that the plaintiffs had no compensable expectancy in the continued artificially elevated salinity levels caused by the Mississippi River levee system in historically freshwater marsh areas within Breton Sound. Avenal v. United States, 33 Fed. CI. 778 (1995). On appeal, the United States Court of Appeals, Federal Circuit, affirmed the decision for different reasons. Avenal v. United States, 100 F.3d 933 (Fed.Cir.1996). The federal appeals court held that the oyster lessees could not have had "reasonable investment-backed expectations" that their oyster leases would give them rights protected from the planned freshwater diversions authorized by the federal and state governments.
Following the decision of the United States Court of Appeals, Federal Circuit, the DNR filed a motion for summary judgment in this state action, arguing that collateral estoppel barred the re-litigation of the "takings" issue already decided by the federal courts. The trial court denied the motion. The DNR sought review of that ruling from this Court. In a 3-2 decision, the majority concluded that genuine issues of material fact existed as to whether the impact of the State's actions on the plaintiffs' oyster leases constituted an inverse condemnation and a "taking" pursuant to Article I,  4 of the Louisiana *714 Constitution of 1974 and remanded the matter to the district court for further proceedings. Avenal v. State, 99-0127 (La.App. 4 Cir. 3/3/99), 757 So.2d 1, cert. denied, 531 U.S. 1012, 121 S.Ct. 568, 148 L.Ed.2d 486 (2000).
In the meantime, on 15 December 1998, the plaintiffs moved to strike all evidence, testimony, and argument regarding hold harmless clauses contained in the oyster lease agreements. The DNR, in turn, filed a motion for partial summary judgment seeking the dismissal of many class members' claims based on the validity of a hold harmless clause inserted into every oyster lease agreement issued from 1989 through 1995, which stated:
This lessee hereby agrees to hold and save the State of Louisiana, its agents or employees, free and harmless from any claims for loss or damages to rights arising under this lease, from diversions of fresh water or sediment, depositing of dredged or other materials or any other actions, taken for the purpose of management, preservation, enhancement, creation or restoration of coastal wetlands, water bottoms or related renewable resources; said damages to include, but not to be limited to, oyster mortality, oyster disease, damage to oyster beds or decreased oyster production, due to siltation, pollution or other causes.
The DNR also argued that the Coastal Wetlands Restoration Advisory clause and the Allocation of Risk and Liability, and Indemnification clause, both of which were inserted into every oyster lease agreement issued as of 1996, also precluded the plaintiffs' from asserting their claims for damages against the State.
Contemporaneously, the DNR filed a motion to close, decertify or, alternatively, redefine the class.[4] The trial court granted the plaintiffs' motion in limine excluding all evidence relating to the hold harmless provisions contained in the plaintiffs' leases and denied the DNR's motion to close, decertify, or redefine the class. As to the DNR's motion for partial summary judgment, the trial court deferred ruling on the validity of the hold harmless and indemnity provisions until "after the jury's findings."
The DNR sought review of the trial court's rulings, filing a writ application with this Court. A three-judge panel of this court denied in part and granted in part the writ application. The majority found no error in the trial court's grant of the plaintiffs' motion in limine to exclude all evidence of the hold harmless provisions. One judge dissented, in part, finding such evidence was relevant and admissible pursuant to the La. C.E. arts. 401-403. All judges, however, agreed that the trial court erred in deferring to rule on the motion for summary judgment and held that it had to either grant or deny the motion at least ten days before trial, citing La. C.C.P. art. 966(D).[5] Nonetheless, the trial court failed to rule on the motion for summary judgment prior to trial.[6]
At trial, the four individual class representatives testified that after the Caernarvon Freshwater Diversion Structure went *715 on-line in September 1991 their private leases within the Breton Basin no longer produced oysters. They attributed the lost production to an increase in sediment and vegetation, specifically eurasian water milfoil, as a result of the inundation of fresh water into the basin. The dense eurasian water milfoil, according to the plaintiffs, prevented their boats from reaching their respective leases.
The plaintiffs also testified that their private leases were adversely affected by the Caernarvon Freshwater Diversion Structure's effect on the DHH's "closure lines."[7] Prior to the diversion, the closure line in the Breton Basin fluctuated several times during the year, moving from the coastline southeast to the Gulf of Mexico during fresher periods (the winter months) and back again when salinity levels increased (the summer months). The plaintiffs testified that due to the closure line's fluctuation, their private leases located within the closed area might be suitable for harvesting once the closure line moved. They further testified that after the Caernarvon diversion, however, the closure line gradually moved southeast towards the Gulf of Mexico and never fluctuated back. As a result, the plaintiffs claimed their private leases were permanently within the closed area and off-limits for harvesting.
Michael Voisin, Chairman of the Louisiana Oyster Lease Task Force,[8] member of the Oyster Lease Damage Evaluation Board[9] ("OLDEB"), and the plaintiffs' *716 expert in oyster farming, corroborated the plaintiffs' claims of permanent damage to the private oyster leases due to the freshwater diversion. In estimating damages to private oyster leases as a result of coastal restoration and oil and gas activities, Voisin explained that the OLDEB employs an Oyster Lease Valuation Matrix, also known as the "cultch currency matrix." The matrix was developed jointly by the Governor's Office of Coastal Activities, the DNR, and the DWF in March 1996 at a two-day workshop hosted by the DNR and attended by environmental scientists, oyster biologists, and representatives from the oyster industry, oil and gas industry, and state and federal agencies. Voisin testified that "cultch," a hard material composed of limestone and crushed shells, is used to build a hard substrate on soft, muddy water bottoms. Cultch is vital to oyster productivity because it creates the reef necessary for seed oysters to attach to and grow. Voisin explained that the matrix values an oyster lease based on the cost to replace the lost or damaged lease and places a different value on the various classifications of substrate, e.g., reef, shell and mud, firm mud, and soft mud.
According to Voisin, the State has used the cultch currency matrix formula in the Davis Pond Relocation Program[10] to exchange, relocate, or purchase private oyster leases located within the Barataria Basin, the target area of the Davis Pond Freshwater Diversion Structure. As applied to the Davis Pond oyster lessees, the matrix allows for 187 cubic yards of cultch per acre of existing cultch, or approximately 1.5 to 1.375 inches of cultch evenly spread across an acre. Voisin testified that 1.375 inches of cultch is sufficient to plant seed oysters, but the oyster industry recommends 3 to 6-inches of cultch to support full oyster growth. He estimated that 400 to 800 cubic yards of cultch would be needed to build a 3 to 6 inch reef across an acre. As to cost, Voisin testified that cultch is approximately $38.00 per cubic yard if it is to be placed on water bottoms in less than 6 feet of water and approximately $50.00 per cubic yard for water bottoms deeper than 6 feet. The cost differential, he explained, is attributed to the size and weight of the vessels employed in laying the cultch.
The plaintiffs also offered the expert testimony of Noel V. Brodtmann, Jr., an environmental consultant who specializes in oyster assessments, to corroborate their claims that the Caernarvon freshwater diversion damaged their oyster leases. In his opinion, the freshwater diversion transformed the ecology of the Breton Sound estuary from a brackish environment that sustained intense oyster growth to a totally freshwater environment incapable of such. Brodtmann agreed that since the Caernarvon Freshwater Diversion Structure went on-line, the DHH seasonal closure line had permanently moved southeast towards the Gulf of Mexico. He attributed the lack of an oyster bloom in the estuary following the 1991 freshet to *717 an "over-freshening" by the Caernarvon freshwater diversion in the latter part of 1991. Brodtmann concluded that freshwater diversions from Bohemia Spillway, White Ditch Siphon, and Bayou LaMoque had very little effect on the Breton Sound estuary because they had been in operation years before the Caernarvon Freshwater Diversion Structure, yet never adversely affected the oyster populations. He also concluded that Hurricane Andrew in 1992 had little impact on the oyster beds east of the Mississippi River even though it heavily damaged oyster beds located west of the river in Lafourche and Terrebonne Parishes.
Referring to the Caernarvon diversion's flow patterns, Brodtmann explained that the structure operated at a minimal flow of less than 1,000 cubic feet per second ("cfs"), when it initially went on-line, and peaked in the third quarter of 1992 at 4,000 cfs. It fell during the first quarter of 1993 and increased to 12,000 cfs in the second quarter of 1993, but operated at that rate for only two days. Flow dropped to 582 cfs in the final quarter of 1993 and then increased to 8,000 cfs in January 1994, where it remained until October 1997. Brodtmann noted that higher rates of oyster mortality and the increased presence of eurasian water milfoil in the basin correlated with peak flow periods, but a resurgence of oyster spat[11] and young oysters appeared in the area shortly after the DNR shut off the freshwater flow in October 1997. Brodtmann opined that the DNR's proposed plan to operate Caernarvon at 8,000 cfs for intermittent two-week periods beginning in 2001 would permanently destroy all oyster populations on the leases.
To estimate the extent of the plaintiffs' losses, Brodtmann conducted field assessments of some of their leases. In addition to maps and surveys provided by the DWF, he used global positioning system ("GPS") data to locate the specific oyster leases. He then "poled" the leased areas to ascertain the substrata characteristics of the water bottoms. The poling procedure entailed probing the water bottoms with a cane pole every eight to ten feet while moving across the leased area in a boat. Brodtmann then classified his findings as reef, firm mud, or soft mud. Poling also helped locate the accumulation of live oysters on a lease surface.
According to Brodtmann, an oyster reef should be at least 3 to 6 inches thick to support an oyster habitat. Like Voisin, he concluded that the cultch currency matrix used by the OLDEB was the best method to calculate damages to an oyster lease. He testified that 403 cubic yards of cultch are needed to build a 3-inch reef on an acre at a cost of $10,676.00 and 806 cubic yards of cultch are needed for a 6-inch reef on an acre at a cost of $21,345.00. The plaintiffs' expert, Randy Rice, Ph.D., an economics professor at Louisiana State University, verified that applying the cultch currency matrix with figures provided to him by the plaintiffs' counsel, 806 cubic yards of cultch at a total cost of $21,345.00 are needed to build 6-inch reef across an acre of water bottoms.
On the cross-examination of Jack C. Caldwell, Secretary of the DNR, the plaintiffs elicited testimony from him that he had testified at a United States Congressional Committee Hearing in February 1996, seeking to obtain federal assistance for the proposed oyster lease relocation program in connection with the Davis Pond Freshwater Diversion Structure, and stated under oath that oyster leases in Plaquemines Parish were worth $7,000.00 per acre. Secretary Caldwell also acknowledged *718 that in January 1999 he had approved the OLDEB's adoption of the uniform evaluation method that used 403 cubic yards of cultch as the estimated amount needed to build a 3-inch reef on an acre of water bottoms.
Prior to trial the plaintiffs filed a motion in limine to exclude all evidence and testimony regarding the biological assessments and side scan sonar surveys[12] conducted by DNR's expert witnesses, Charles A. Wilson, Ph.D., and Harry H. Roberts, Ph. D., experts in estuarine ecology and geography, respectively, at the LSU Coastal Studies and Fisheries Institute. The DNR intended to introduce the side scan sonar surveys to prove the amount of reef on the individual plaintiffs' oysters leases and to refute the claim that an acre of leased water bottoms contained at least 403 cubic yards of cultch. During the course of trial, without the Injury present, the trial court conducted a Daubert[13] hearing to consider the plaintiffs' motion.
Although Drs. Wilson and Roberts testified extensively regarding the side scan sonar methodology, the trial court granted the plaintiffs' motion. Construing side scan sonar and ground truthing as two distinct methodologies, each used independently of the other, the trial court concluded that ground truthing contradicted side scan sonar findings. The trial court also determined that the side scan sonar methodology had never been published or peer reviewed and its results were subject to a 400 percent rate of error.[14]
Nonetheless, to counter the plaintiffs' claims that the freshwater diversion from the Caernarvon structure was the sole cause of substantial damage to all oyster leases within the Breton Sound estuary, the DNR offered a plethora of scientific evidence. William Joseph Wiseman, Jr., Ph.D., an expert in physical oceanography and hydrology, testified extensively regarding the temperatures, salinity levels, currents, tidal waves, and mixing processes of the waters in the Breton Sound estuary. *719 According to Dr. Wiseman, the Corps conducted a dye study in August 1991 in which dye and water were released from the Caernarvon Freshwater Diversion Structure and tracked for a four-day period. The dye acted as a tracer only and had no affect on the water's flow. Once released, the dye followed two paths. Some of the dye descended from the structure and flowed eastward into Lake Leary, where it diffused and could no longer be tracked. The remainder descended to Bayou Manuel and entered River Aux Chenes on the western side of the Breton Basin. At the time of the study, mild winds from the east blew the dye to the west.
However, Dr. Wiseman also reviewed satellite images of the earth's surface taken in March 1989 and January and May 1994 using Advanced Very High Resolution Radiometer ("AVHRR"). The pictures, he testified, reflected the amount of suspended sediment in the water based on the direction of the wind at that time. From the pictures, Dr. Wiseman concluded that fresh water from Caernarvon flowed from the upper northwest area of the Breton Basin southeast to the lower end and remained within the natural boundaries of River Aux Chenes to the west and Bayou Terre Aux Boeufs to the east, regardless of the direction of the wind. He explained that the freshwater had a dominant effect only on the salinity levels in the very northwest area of the Breton Basin, and the further it flowed southeast away from the structure its effect lessened. Dr. Wiseman also testified that it had no effect in areas of the Breton Basin west of River Aux Chenes and east of Bayou Terre Aux Boeufs.
Unlike Brodtmann, Dr. Wiseman found that the other freshwater diversion structures along the Mississippi River, south of Caernarvon, greatly influenced the salinity levels in the upper Breton Basin. According to him, the southeast winds during the spring, summer, and early fall blew significant amounts of fresh water into the upper Breton Basin. Dr. Wiseman also testified that in addition to winds, tidal waves, rainfall, and temperature also affected the salinity levels of the waters in Breton Sound.
Dr. Good corroborated Dr. Wiseman's testimony that several factors affected the salinity levels within the Breton Sound estuary, which in turn influenced the DNR's operational plan for the Caernarvon structure. He testified that initially the DNR operated the structure at a minimal flow due to the high oyster mortality as a result of the 1991 freshet. In August 1993, the DNR decided to increase the flow in January 1994 to 8,000 cfs. Although this plan remained in effect until November 1997, Dr. Good demonstrated that often the water did not flow at 8,000 cfs because the water level of the Mississippi River was too low. He also testified that in November 1997, the DNR reduced winter diversions from 8,000 to 4,000 cfs and from 3 to 2.5 weeks. And in January 2001, the DNR would implement a "pulsing" operation, increasing the flow to 8,000 cfs for intermittent two-week periods.
Dr. Good noted that as a result of the freshwater diversion from the Caernarvon Freshwater Diversion Structure since 1991, the marsh increased 5.9% annually. This increase, he testified, was not the result of large sediment deposits, but rather the result of freshwater nutrients stimulating marsh vegetation growth. According to Dr. Good, approximately 2,000 truckloads of sediment passed through the Caernarvon Freshwater Diversion Structure in November and December 1991, yet most of it settled in Big Mar, the large body of water near the structure that acted as a sediment trap. He explained that the sediment diverted from the structure *720 deposited within 7.7 miles of the Caernarvon structure. Dr. Good characterized as sediment "plume" or nutrient laden sediment any suspended sediment found in the water beyond the 7.7-mile radius. He opined that it was impossible to determine the origin of sediment found in the Breton Sound estuary, explaining that sediment on public seed grounds 24 miles from the Caernarvon Freshwater Diversion Structure could have come from freshwater diversion projects south of Caernarvon such as Bayou LaMoque.
According to Dr. Good, prior to Caernarvon's construction, saltwater intrusion from the Gulf of Mexico destroyed 50,000 acres of oyster supporting water bottoms. The public seed grounds, on which all oyster farmers depended, were nearly obliterated. After the Caernarvon freshwater diversion, oyster productivity on public seed grounds increased 300%. Dr. Good also noted that the reduction in the flow of the fresh water in November 1997 correlated with a decrease in oyster production from the public seed grounds in 1998. Nonetheless, he concluded that all oyster fishermen benefited from the Caernarvon's fresh water flow.
Kenneth W. Hemphill, Sr., the DHH's administrator of the shellfish and mollusk program, testified, contrary to the plaintiffs' claims, that the Caernarvon freshwater diversion alone had little impact on the DHH's seasonal closure lines. He attributed the directional changes in the seasonal closure line to the amount of rainfall, the extent of drought, and temperature fluctuations in the Breton Sound estuary.
Sherwood Gagliano, Ph.D., an environmental scientist with an expertise in geography and geology, corroborating Dr. Good's testimony, agreed that Caernarvon's freshwater flow was contained between River Aux Chenes to the west and Bayou Terre Aux Boeufs on the east.
Noting the significance of the Trans-Gulf twin pipeline that ran north from the Mississippi River Gulf Outlet and south to the Mississippi River, he testified that most oyster productivity within the Caernarvon impact area and 5 ppt zone occurred on leases along the pipeline. Dr. Gagliano reiterated that stabilizing the salinity levels within the Breton Basin and preventing saltwater intrusion were the primary goals of freshwater diversion. He described the Caernarvon project as a "control structure" that "skimmed" fresh water and "light" sediment from the river. Because the structure was located above the base of the Mississippi River, it was impossible to divert large sediment deposits from the river's bottom through the structure and into the Breton Basin. Thus, the sediment diverted through the structure, alone, was insufficient to rebuild the State's coast. Although Dr. Gagliano acknowledged that the Caernarvon project "unavoidably" altered salinity conditions in the upper northwest end of the Breton Basin, making the area less favorable to oyster cultivation, he emphasized that the Breton Sound estuary's changing ecosystem shifted the salinity zones eastward to the Gulf of Mexico, enhancing the development of brackish marshes in areas once too fresh to support oyster growth. The diversion, he explained, not only increased oyster productivity on public seed grounds, but eventually would restore 124,000 acres of marsh necessary for the creation of water bottoms suitable for oyster production. Thus, Dr. Gagliano opined that Louisiana's oyster industry would benefit greatly from the Caernarvon Freshwater Diversion Structure.
John W. Day, Jr., Ph.D., professor of oceanography and coastal studies at Louisiana State University, corroborated the testimony of Drs. Good and Gagliano. After conducting studies on the sediment *721 deposits in the Breton Sound estuary as a result of the Caernarvon freshwater diversion, Dr. Day found approximately onehalf inch of sediment per year deposited in "stations" located very near the Caernarvon structure. He found no significant increase in sediment in test stations in the lower end of the Breton Basin. He attributed the "slight" sediment deposits found in stations located near the Mississippi River to the river's discharge rather than to Caernarvon's flow. He, too, concluded that the sediment in the fresh water from Caernarvon was mineral and nutrient laden, which stimulated vegetation growth.
Gaines Geaghan, Ph.D., an expert in statistics and marine zoology, did a "postconstruction analysis" of the Breton Basin using data collected by the DWF, the DNR, and the Corps from various "collection sites" located throughout the Breton Sound estuary. The DWF, he explained, monitored oyster growth using "nestier trays" located in sampling stations throughout the Breton Basin. The trays contained 20 individual compartments wherein oysters nested. The DWF biologists examined the trays monthly to determine the oysters' development and recorded their findings. Based on the recorded data, Dr. Geaghan demonstrated through graphs that the oyster mortality rate in the Breton Basin was very low from year 1988 until May 1991 when it increased drastically as a result of the freshet. The oyster mortality rate declined in 1992 but rose again in February of 1993, where it remained until the end of the year. In January 1994, it increased to 70% and continued to rise. By the end of 1995, the oyster mortality rate had reached 95%. It remained high from 1995 through 1997, then steadily declined in years 1998, 1999, and 2000.
Dr. Geaghan also analyzed weather and salinity patterns. He found that in the summer of 1991, following the freshet, oyster mortality appeared in the mid and lower regions of the Breton Basin. After Caernarvon went on-line, however, high oyster mortality appeared in the upper, northwest region of the Breton Basin near Lake Leary. In addition to the Caernarvon discharge, he attributed an increase in the oyster mortality rate to heavy rainfall and river discharges. He found salinity changes in the upper Breton Basin directly correlated to the Caernarvon diversion, whereas lower basin salinity changes correlated to river discharges. Also, he concluded that fresh water from the Bohemia structure, Bohemia Spillway, and Bayou LaMoque extended to upper areas of the basin, affecting salinity levels, vegetation, fisheries and wildlife, although to a lesser degree than the Caernarvon diversion.
At the DNR's request, Ronald Kilgen, Ph.D., an expert in oyster biology, and Maureen Mulino, Ph.D., an aquatic biologist with Steimle & Associates, Inc., an environmental studies firm, surveyed 21 oyster leases at issue in the present litigation on two separate occasions in late 1998 and early 1999. Dr. Kilgen testified that after poling the leases and ascertaining their substrates, he categorized his findings into three groups: (1) leases with no live oysters; (2) leases with spat (oysters less than a year old); and (3) leases with oysters 2, 3, and 4 years old. He determined that the leases with no live oysters were located in the upper region of the Breton Basin, west of the double pipeline. He found leases that produced at least 50 sacks of "marketable" oysters per day in the lower region of the Breton Basin both west and east of the double pipeline. Also, he located leases that produced more than 50 sacks of oysters per day in the upper and lower regions of the Breton Basin either near or west of the double pipeline. Notably, too, Dr. Kilgen discovered leases with significant oyster yields adjacent or in *722 close proximity to leases with no evidence of oysters. He attributed this finding to the fact that the respective lessees never managed the leases and/or many leases lacked reef necessary for oyster cultivation. According to Dr. Kilgen, the absence of reef, oyster shells, or oyster mortality on a lease indicated that the lease never did produce. He further testified that a study of leases in the area from the 1970's through 1990's revealed that even before the Caernarvon diversion in 1991 many oyster leases in the upper Breton Basin had never produced. Although Dr. Kilgen admitted on cross-examination that the Caernarvon's flow altered salinities, adversely affecting many leases in the upper Breton Basin, he emphasized that many leases had no prior history of production. Furthermore, Dr. Mulino testified that the lease surveys disclosed no areas of mass buried shells to indicate sediment had covered productive leases. In fact, she discovered no significant amount of sediment.
As to the eurasian water milfoil, Dr. Kilgen testified that it was plentiful along the entire Louisiana coast in 1994 and 1995, noting that it posed a significant problem to oyster leases in Lafourche and Terrebonne Parishes, which had never experienced a freshwater diversion. In his opinion, heavy rainfall proliferated the dense vegetation. Robert Anclet, a retired biologist who had been employed by the DWF for 28 years and managed fisheries in Coastal Area two, which included Breton Sound, agreed, testifying that, even prior to the Caernarvon diversion in 1991, he found eurasian water milfoil along the entire coast.
To counter the plaintiffs' evidence regarding the value of their oyster leases, the State relied on the testimony of James Hanchey, assistant secretary of the DNR's Office of Coastal Restoration. Hanchey testified that the OLDEB was created pursuant to state statute to resolve conflicts between the oil and gas industry and the oyster industry that arose as the result of oil and gas exploration and production. Because the State has a tremendous interest in protecting the viability of both industries, he explained, it sought an equitable solution that resulted in fair treatment to the oil and gas industry while assuring the oyster fisherman actual compensation for damages to their oyster beds due to mineral activities. In other words, the State wanted to establish a uniform system of compensation for actual damages caused to the beds of oyster leaseholders.
Regarding the OLDEB's adoption of a uniform evaluation method, specifically, the cultch currency matrix, Hanchey testified that he had expressed serious reservations to Secretary Caldwell of the DNR at the board's meeting in January 1999 about adopting the matrix. Hanchey explained the DWF initially estimated that approximately 150 to 187 cubic yards of cultch per acre were needed to create reef on water bottoms, but later changed the estimate to 403 cubic yards per acre. The drastic alteration, he testified, was not based on scientific data, but rather on the oil and gas industry's acquiescence to the oyster fishermen's wishes. According to Hanchey, at the time, the oil and gas industry had several proposed projects whose commencement dates depended on the oyster lessees' authorizations to conduct surveys, exploration, and other activities on their leases. Failure to get proper authorization would jeopardize the projects and likely result in severe penalties and delay costs. Hanchey testified that the oil and gas industry compromised, believing the evaluation process and its projects were "doomed" if it did not agree on the 403 cubic yards of cultch per acre figure for application in the matrix.
*723 In support of Hanchey's testimony, the DNR introduced into evidence the minutes from the OLDEB meeting on 5 January 1999. The minutes also reflect that Secretary Caldwell expressed his concern that certain values were higher than he thought they should be and "wanted to go on record that ... the evaluation guidelines are specifically intended to be used by the Oyster Lease Damage Evaluation Board in their processes and should not be construed as representing the State of Louisiana's view as to values that could be used in other kinds of circumstances."[15]
Hanchey testified that two factors comprised the oyster damage evaluation method used by the OLDEB, the cultch currency matrix and the standing oyster crop. The matrix, he explained, provided a method for compensating for substrate damage as the result of oil and gas activities, such as laying pipelines, while the standing oyster crop factor considered pre-project and post-project biological data to determine the value of an oyster crop loss on a particular lease. The pre-project and post-project biological data, including oyster lease surveys and assessments, were not available on all leases in the Caernarvon and Davis Pond impact areas, which Hanchey explained made the methodology impractical to use in diversion projects. In his opinion, the method for evaluating damages to an oyster lease as the result of oil and gas activity was not appropriate for determining damages to oyster leases as the result of freshwater diversion projects such as Caernarvon and Davis Pond. He emphasized that an oyster bed incurred damage to its substrate as the result of oil and gas activity, yet did not incur damage to its substrate as the result of freshwater diversion. He also noted that the cultch currency matrix formula developed for use in the Davis Pond Relocation Program allowed for 150-187 cubic yards of cultch only on acres with existing cultch and active and productive oyster leases. In other words, the Davis Pond Relocation Program formula did not allow compensation for areas of oyster leases that did not contain cultch material or hard bottom. Also, the formula provided no compensation for oyster leases located outside the project's target area.
Hanchey further testified that if the cultch currency matrix was to be used to value leases throughout the Breton Basin in this case, then the "Melancon Map" must be used in conjunction with it. The map, he explained, delineated oyster production zones based on salinity levels and discounted the cultch currency matrix accordingly. Less productive leases located outside the optimum salinity zone were discounted substantially. For example, the value of oyster leases located in the fresher, northern region and saltier, southern regions of the Breton Basin was discounted from 403 cubic yards of cultch per acre to 10% of that or 40 cubic yards per acre. Hanchey demonstrated that the Davis Pond Relocation Project did not use the Melancon Map to discount oyster leases because the relocation involved only active and productive leases located north of the 5 ppt line. Nevertheless, he reiterated that the OLDEB had to consider salinity regimes and apply the map to the cultch currency matrix in determining lease damages as a result of oil and gas activity because such activity occurred throughout the entire basin.
Walter R. Keithly, Jr., Ph.D., a resource economist and LSU assistant professor appointed to both the Coastal *724 Fisheries Institute and Institute for Environmental Studies, testified for the State as an expert in evaluating the seafood industry. The cost of and amount of cultch on a lease, he explained, was not the only factors to be considered in determining the value of a lease. Dr. Keithly emphasized that the costs associated with oyster production and the revenues generated therefrom must also be considered. The "market value" of an oyster lease, he explained, was the price a willing buyer would pay to a willing seller for the lease, and long-term, the value would not exceed the income derived from the lease.
Dr. Keithly noted that from the mid 1980's to early 1990, many of the leases at issue in the instant litigation were nonproductive because they fell within the seasonal closure line. Although, in some instances, the DHH allowed the oyster fishermen to "relay" their oysters to productive leases, the cost of doing so exceeded any benefit because oyster prices were low at the time. Dr. Keithly also noted that even though many of the leases were unproductive and/or the DHH had deemed them unsuitable for production purposes for extended periods, the leaseholders yearly chose to renew and retain the leases because they derived substantial revenues from oil and gas interests, who continued to conduct surveys, seismic activities, oil exploration, lay pipelines, et cetera, on the leases.
Contrary to the plaintiffs' claims, Dr. Keithly testified that the cost to restore a lease did not equal its value, explaining that the costs of laying cultch and building reef, in some cases, might exceed the revenues generated from the lease. He also noted that, in terms of oyster production, a lease's value was the income generated from it. "As a rule of thumb," Dr. Keithly explained, if the value of a lease is less than its restoration cost, a prospective buyer would pay the value. To calculate the average value of oyster leases in Plaquemines Parish for the period 1988 through 1997, Dr. Keithly reviewed data from the DWF detailing the number of leased acres, the amount of oysters harvested yearly from the leases, the price of oysters, and bills of sale on lease transfers. In addition, he reviewed tax and business records from several oyster fishermen. Along with the data, Dr. Keithly considered the 1993 Anderson Study,[16] which concluded the average value of an oyster lease ranged from $160.00 to $170.00 per acre. Based on his research, Dr. Keithly determined that the average value of a lease in Plaquemines Parish prior to Caernarvon going on-line was $200.00 per acre. As to the class representative's leases, Dr. Keithly estimated the average value of Skansi's leases to be $558.00 per acre prior to Caernarvon going on-line and $343.00 per acre afterwards. He attributed the sharp decline to a reduction in the price of oysters and low productivity. Dr. Keithly testified that the average value of Avenal's leases was $195.00 per acre prior to Caernarvon going on-line but much lower following the freshwater diversion because Avenal had purchased many of the leases at public auction after 1991 when other leaseholders chose not to renew the leases due to low productivity. In fact, Avenal admitted that he purchased two of his *725 leases on the same day this suit was filed. Duplessis had provided Dr. Keithly with production records for only six months of the year 1990, evidencing the lessee harvested 1.4 sacks of oysters per acre on a 155-acre lease. The records also showed that Duplessis began subleasing acreage from Fox in 1991. Dr. Keithly testified that Duplessis' leases were neither productive nor valuable, noting that Duplessis would not have subleased from Fox if his own leases had been productive. As to Fox, Dr. Keithly testified that he had leases located throughout the basin, many of which were sublet to other oyster fishermen. Fox's records, however, contained scarce harvesting information. Nonetheless, based on the other available data, Dr. Keithly estimated the average value of Fox's leases at $200.00 per acre.
Over the plaintiffs' objection, the trial court allowed the DNR to introduce into evidence seafood dealer records from plaintiff, Rodney Fox, an owner of R & A Oyster Company, Inc., and son of Kenny Fox.[17] The records disclosed that from 1997 to 2000, Lease 31453 produced 16,612 sacks of oysters. Rodney Fox acknowledged that his gross sales for 1999 totaled $3.8 million. In addition, he admitted that many leases that were deemed unsuitable for production as the result of the freshwater diversion in 1991 were now producing. The DNR also elicited testimony from the named individual plaintiffs on cross-examination that they continued to collect thousands of dollars for damages to their leases in the Breton Basin from oil and gas interests as the result of oil and gas exploration activities.
After the eight-day trial on the merits, the jury returned a verdict in favor of the five class representatives, responding "yes" to the jury interrogatory, "Do you find that the State has taken actions which have taken or damaged the [plaintiffs'] right to property?" [Emphasis added.] It found Avenal, Duplessis, Fox, Fox Oyster Company, and Skansi sustained damages on 826, 255, 948, 759 and 261 acres of their leased water bottoms, respectively. The jury determined that an amount of $21,345.00 per damaged acre would adequately compensate plaintiffs Duplessis, Skansi, Fox, and Fox Oyster Company for their losses, while $1,000.00 per damaged acre would compensate Avenal.
Prior to the trial court rendering its judgment, on 2 January 2001, the DNR filed motions for judgment notwithstanding the verdict ("JNOV"), new trial, or alternatively, remittitur. Several days later, the trial court, in accordance with the jury's verdict, rendered judgment awarding Avenal' $826,000.00; Duplessis $5,442,975.00; Fox $20,235,060.00; Fox Oyster Company $16,200,885.00; and Skansi $5,571,045.00. The awards combined totaled $48,275,935.00. Likewise, the court awarded the remaining class members similarly situated to Avenal and those similarly situated to the four other class representatives their respective damages. In addition to compensatory damages, the judge awarded the plaintiffs attorney's *726 fees pursuant to La. R.S. 13:5111 and court costs.
On 12 January 2001, the DNR again filed motions for JNOV, new trial, or alternatively, remittitur. The trial court denied all post-trial motions filed in the trial court. On 16 March 2001, the DNR filed an application for supervisory writs seeking review of the trial court's denial of its motion for new trial and its refusal to abide by this Court's 15 December 2000 ruling that the trial court either grant or deny the motion for partial summary judgment on the indemnity issue at least ten days prior to trial. This court declined to exercise its supervisory jurisdiction, ruling that the DNR's writ application should be consolidated with its pending appeal.[18]
Assignments of Error
On appeal, the DNR raises the following fourteen (14) assignments of errors:
(1) The jury erred in awarding the plaintiffs damages for the restoration of state-owned water bottoms.
(2) The trial court erred as a matter of law by allowing the plaintiffs to recover from the State the costs for restoring the State's own water bottoms.
(3) The trial court erred in allowing the plaintiffs to recover damages based upon the cultch currency matrix rather than recognized elements of damages.
(4) The trial court erred in awarding damages in excess of the fair market value of the plaintiffs' leases.
(5) The jury erred in finding that the Caernarvon freshwater diversion flow was the proximate cause of the plaintiffs' damages.
(6) The trial court erred in giving a jury interrogatory that improperly eliminated the plaintiffs' burden of proving a permanent taking.
(7) The jury verdict and trial court judgment are contrary to the law and evidence presented at trial.
(8) The trial court erred in refusing to decertify or redefine the class.
(9) The trial court erred in extrapolating the jury's verdict class-wide as it eliminated the plaintiffs' burden of proving causation for the remainder of the class.
(10) The trial court erred in excluding the State's side scan sonar evidence.
(11) The trial court erred in not finding that the plaintiffs' claims have prescribed pursuant to La. R.S. 9:5624.
(12) The trial court erred in forcing the State to exhaust its peremptory challenges by allowing biased persons to remain on the jury.
(13) The trial court erred in awarding damages for oyster leases in which the plaintiffs' held no compensable interest.
(14) The trial court erred in refusing to determine prior to trial the validity of the indemnification clauses contained in the plaintiffs' oyster leases.[19]
*727 Plaintiff Avenal, the only individual class representative to appeal, argues that the jury erred in awarding him only $1,000.00 per damaged acre while awarding the other class representatives $21,345.00.
Because I would resolve the merits of this case in its entirety on only some of these assignments, I would pretermit a discussion of the remainder.
Discussion of the Law and Facts.
La. R.S. 41:1225 authorizes the DWF to grant leases on state-owned water bottoms for oyster cultivation, bedding, and harvesting, and matters relating thereto, as provided in Subpart D of Part VII of Chapter 1 of Title 56 of the Louisiana
Revised Statutes of 1950, i.e., La. R.S. 56:421 et seq. Accordingly, La. R.S. 56:425 provides that the secretary of the DWF may only lease state-owned water bottoms and natural reefs on the water bottoms of the State to a resident, a firm composed of residents, or a corporation domiciled in or organized under the laws of Louisiana. The secretary's right to grant oyster leases is likewise contingent upon a determination that the State owns the water bottoms to be leased, and that the lessee agrees that he will operate under Louisiana laws and pursuant to the DWF's rules and regulations. La. R.S. 56:425 A and B. All leases made under the provisions of Subpart D begin on the date the lease is *728 signed and continue for a period of fifteen years. La. R.S. 56:428 A. The owners of expiring oyster leases have the first right of renewal of their oyster leases provided the lease is capable of supporting oyster populations. Id.
Regarding the property rights of an oyster lessee, La. R.S. 56:423 provides, in pertinent part:
A. A lessee shall enjoy the exclusive use of the water bottoms leased and of all oysters and cultch grown or placed thereon, subject to the restrictions and regulations of this subpart.
B. (1) A lessee of oyster beds or grounds who has obtained, recorded and marked his lease in compliance with the law shall have the right to maintain an action for damages against any person, partnership, corporation or other entity causing wrongful or negligent injury or damage an action for damages to the beds or grounds under lease to such lessee.
* * *
(3) Any action for damages under this Section shall be brought within one year of the occurrence of the wrongful or negligent act, or within one year of the date of discovery of such act, whichever last occurs.
Louisiana courts have recognized that the statutory laws relative to the leasing of water bottoms for oyster production differ from the provisions that govern ordinary conventional leases addressed in Title IX of Book III of the Civil Code, La. C.C. arts. 2668 et seq. Jurisich v. Jenkins, 99-0076 (La.10/19/99), 749 So.2d 597, citing Vujnovich v. Louisiana Wildlife & Fisheries Comm'n, 376 So.2d 330 (La.App. 4 Cir.1979); see also Inabnet v. Exxon Corp., 93-0681 (La.9/6/94), 642 So.2d 1243 (Kimball, J., dissenting in part). The major difference concerns: "oyster lease renewal is statutorily provided and is not contingent upon a contractual provision for its existence." Jurisich at p. 6 n. 4, 749 So.2d 600 n. 4.

The Inabnet Decision
The Louisiana Supreme Court in Inabnet, supra, considered whether an oyster lessee had a right to recover, as damages, the cost of restoring oyster beds damaged by the defendant company's dredging operations. The plaintiff, an oyster lessee, sought to recover damages to his oyster lease caused by dredging operations conducted by an independent contractor for Exxon Corporation, who held a surface lease and canal right-of-way that predated and overlapped the plaintiff's oyster lease. The court addressed the correlative rights and obligations of the two parties, both as holders of coexisting rights to the same property and as holders of rights on neighboring properties. The Court concluded that the parties held coexisting rights only on the property covered by Exxon's right-of-way and surface lease, an area of 8.2 acres. As to these 8.2 acres, the Court determined that the liability of one for damage to the other depends on proof of more than just causation and damages. 93-0681 at pp. 14-15, 642 So.2d at 1252-53.
The record disclosed that in 1972 Exxon acquired the right from the State to dredge, maintain and use the canal on the right-of-way and to install and operate a tank battery on the surface lease. When the plaintiff acquired his oyster lease ten years later, the canal had been dredged and was being used, and the tank battery had been constructed and was operating. The nature of Exxon's existing use incidental to its surface lease and right-of-way precluded oyster production on the same property and made the 8.2 acres unavailable for the plaintiff's use under his lease. Moreover, Exxon's maintenance dredging in 1983 did nothing to cause further damage *729 to the plaintiff's right to use the 8.2 acres for growing oysters, because that right was already nil. The State, if it had not granted the plaintiff's oyster lease, would have had no right to use the 8.2 acres in a manner inconsistent with Exxon's use, and the plaintiff did not acquire under the oyster lease any rights greater than those of the landowner. Thus, the Court concluded that Exxon was not liable for any damages to the plaintiff in their relationship as holders of co-existing right to the 8.2 acres. Id. at pp. 15-16, 642 So.2d at 1253.
As to Exxon's liability in its relationship with the plaintiff as neighboring proprietors, the Court noted that pursuant to La. C.C. arts. 667-669, Exxon was prohibited from performing any actions on its surface lease and right-of-way that would cause damage to the plaintiff on the adjoining property or interfere substantially with the plaintiff's enjoyment of the property, and the plaintiff was required to tolerate some inconvenience from Exxon's normal use of its property rights. The Court determined that the 1983 dredging caused damage to property that was within the plaintiff's oyster lease but outside of Exxon's surface lease and servitude. The damaged property consisted of 4.28 acres dredged by Exxon to the west of the right-of-way, the 5.13 acres east of the right-of-way on which Exxon deposited dredged materials and created a spoil bank, and the 13.84 acres of slumped spoil spread area and prop wash area. The Court found that Exxon was liable for the damages sustained by the plaintiff because of the dredging on the 4.2 acres west of and outside the right-of-way. Id. at pp. 16-17, 642 So.2d at 1253-54. As to the spoil bank area and slumped spoil spread area, the Court noted that Exxon's 1972 right-of-way agreement gave Exxon the right to deposit soil on banks, but was silent as to any right to spread dredged materials or to establish a spoil bank outside the servitude. Because Exxon did not obtain any express authority from the State to establish a spoil bank or to spread the spoil in the bay, the Court concluded that Exxon's use of the property in its servitude area in such a manner as to injure its adjoining neighbor constituted fault under La. C.C. art. 2315, by analogy to La. C.C. arts. 667-669, and that Exxon's use occasioned more than mere inconvenience to the neighbor. Thus, the Court concluded that Exxon was liable without negligence for the damages sustained by the plaintiff because of the manner of disposition of the dredged materials and the slumping of the spoil from the bank. Id. at pp. 18-19, 642 So.2d at 1255.
Significant to the current case, the Court, addressing the issue of damages, found that the trial court erred in awarding the plaintiff oyster lessee the cost of restoring the water bottoms to their original condition by removing the spoil bank and by reconstructing the marsh mat with a 6-inch mat of shells over the entire damaged area of more than twenty-six acres. The Court stated:
La.Rev.Stat. 56:423 B(1) recognizes an oyster lessee's right to recover his own damages for injury to his oyster beds. The awards for loss of seed oysters and loss of income from anticipated production were based on this right of recovery. However, the statute cannot reasonably be construed to authorize recovery of damages sustained by another party. The critical question, therefore, is whether plaintiff has a real and actual interest in recovering restoration costs in this particular case. (Footnote omitted).
Id. at pp. 19-20, 642 So.2d at 1255. In footnote 15 of the opinion, the Court expressed its concern with allowing a nonowner *730 to recover the costs of restoring state-owned water bottoms, noting:
The owner of water bottoms is normally the party with the right of action to recover the costs of restoration. In some situations, as in a long-term lease in which the lessee has made significant improvements, the lessee may have a greater interest than the owner in restoring damaged property. The present case, however, does not present such a situation. Moreover, if the oyster lessee were allowed to recover damages for injury to the water bottoms, the lessee would not be obliged to restore the water bottoms and could use the money as he pleases, leaving the owner (the State) without even the opportunity to accomplish the restoration.
Id. at p. 20 n. 15, 642 So.2d at 1255-56 n. 15. Nonetheless, the Court emphasized that:
This is not to say that Exxon's dredging did not cause plaintiff damages to his leasehold interest, in addition to the loss of seed oysters and loss of anticipated income from production from those oysters. The value of plaintiff's leasehold interest may have been reduced by destruction of or damage to the water bottoms, and plaintiff has a real and actual interest in that recovery. However, that item of damages is measured in this case by the value of the leasehold interest before and after the dredging, and not by the cost of totally rebuilding the water bottoms to their former condition.
Id. at p. 21, 642 So.2d at 1256.
The record before us discloses that other than their own self-serving testimony regarding the damages to their oyster crops and leases resulting from the freshwater diversion, the plaintiffs put forth no evidence generally submitted in expropriation, inverse condemnation, or oyster lease damage cases. The record contains no evidence of the money, time, and effort expended by the plaintiffs in developing their leases. The plaintiffs failed to produce any evidence of the fair market value of their oyster leases before and after the freshwater diversion. Nor did they put forth documentary evidence such as state and federal income tax returns or oyster production records to reflect their sales, income, profits, and losses for the years before and after the freshwater diversion. Rather, the plaintiffs chose to rely solely on the application of the cultch currency matrix formula to prove their damages in this case. To the extent the jury utilized the cultch currency matrix to determine the value of the plaintiffs' oyster leases based on the cost of restoring the stateowned water bottoms and quantified the damages accordingly, the jury's verdict is clearly contrary to the Supreme Court's holding in Inabnet that only the State, the owner of the water bottoms, may recover as damages the costs of restoring and rebuilding the water bottoms to their predamaged condition. Nonetheless, the plaintiffs argue that Inabnet, which involved a tort action, is inapposite to the present action in inverse condemnation.

Law of the Case Doctrine
Thus, the threshold issue to be addressed in this appeal is whether the law of the case doctrine[20] applies such that our *731 earlier decisions in Avenal v. State, Dept. of Nat. Resources, 95-0836, 95-2421 (La. App. 4 Cir. 11/30/95), 668 So.2d 1150, and Avenal v. State, supra, preclude us from considering whether the plaintiffs' action is one in tort rather than in inverse condemnation. The plaintiffs contend that the aforementioned decisions establish that the instant suit is an inverse condemnation for the appropriation or taking of their property and governed by La. R.S. 13:5111. I do not, however, find this to be the case.
In support of a finding that a taking concurred in this case, the majority states:
In fact, two prior published decisions of this court have held that this is a takings case. See Avenal v. State, 99-0127 (La.App. 4 Cir. 03/15/00), 757 So.2d 1; Avenal v. State, DNR, 95-0836 (La.App. 4 Cir. 11/30/95), 668 So.2d 1150.
XXXX-XXXX at p. 12, at 705.
I find that the majority misreads our holdings in those two earlier cases.
In Avenal v. State, Dept. of Nat. Resources, supra, this court considered the trial court's denial of the State's exception of improper venue and dilatory exception of nonjoinder of a necessary party. While we noted that, "a simple review of plaintiffs' petition is one of inverse condemnation," we concluded that "after a trial on the merits, the courts will have to determine if there was in fact a taking of property rights within the purview of Article I, [ ] 4" as "that issue is not before us at the present time." [Emphasis supplied.] Moreover, in Avenal v. State, supra, which was before us on supervisory writs to review the trial court's denial of a motion for summary judgment, a majority of the court determined that "[b]ecause the defendants have not paid any compensation to the plaintiffs, this case may amount to inverse condemnation." [Emphasis added.] In neither of the aforementioned cases did we specifically state or hold that the plaintiffs' claims constituted a taking within the meaning of Article I,  4 of the Louisiana Constitution. Thus, this court is not bound by a prior holding that the plaintiffs' claims amount to an inverse condemnation and a taking within the purview of Article I,  4. By upholding the denial of the trial court's denial of a motion for summary judgment, we only held that a genuine issue of material fact existed that precluded the granting of the summary judgment.
Louisiana Code of Civil Procedure establishes a system of fact pleading. See La. C.C.P. art. 854. If facts constituting a claim are alleged, the party may be granted relief to which he is entitled under the pleadings and the evidence; the "theory of the case" doctrine, under which a party must select the theory of his case and adhere to it throughout the litigation, has been abolished. See La. C.C.P. art. 862; First South Production Credit Assoc. v. Georgia-Pacific, 585 So.2d 545 (La.1991).
As previously mentioned, the plaintiffs herein allege in their petition that they currently own or have owned oyster leases that have been damaged as a result the DNR's diverting freshwater from the Mississippi River through the Caernarvon Freshwater Diversion Structure into the areas of their leases. They further allege that the fresh water diluted the water salinity levels adversely affecting their oyster leases by killing oysters and rendering the beds unsuitable for further cultivation. A fair reading of the plaintiffs' petition is that they are seeking damages *732 for the destruction of their leases. That claim is not limited by the specific reference in the petition to seeking compensation for the destruction of their leases "which were appropriated for public use by the State through the actions of the [DNR]" and "taken pursuant to Article I,  4." The plaintiffs' demand does not foreclose their right to recover other damages to which they may be entitled under the facts asserted, i.e., tort damages. At the same time, it does not preclude a determination by this Court that plaintiffs' claims are delictual only. That being said, I now consider whether plaintiffs' claims constitute a "taking" or an appropriation (inverse condemnation).

Article I,  4 of the Louisiana Constitution and Its Interpretation
Authorization for bringing an action for compensation following a taking by a public entity is grounded in Article I,  4 of the 1974 Louisiana Constitution, which provides:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction.
Personal effects shall never be taken. But the following property may be forfeited and disposed of in a civil proceeding, as provided by law: contraband drugs; property derived in whole or in part from contraband drugs; property used in the distribution, transfer, sale, felony possession, manufacture, or transportation of contraband drugs; property furnished or intended to be furnished in exchange for contraband drugs; property used or intended to be used to facilitate any or the above conduct; or other property because the above described property had been rendered unavailable.
This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes.
[Emphasis added.]
The term "property" encompasses both tangible and intangible property rights, including a lessee's leasehold interest, even if unrecorded. State Dept. of Transportation and Development v. Jacob, 483 So.2d 592 (La.1986).
Recognizing a property owner's right to compensation pursuant to Article I,  4 when a public entity has taken or damaged his property without proper expropriation proceedings, the Louisiana Supreme Court in Constance v. State Through Dept. of Transp. & Development Office of Highways, 626 So.2d 1151, 1156 (La.1993) stated:
La. Const. art. I,  4 and its predecessor article, La. Const. of 1921 art. I,  2, have been interpreted to support a proceeding by a property owner for a *733 taking or damaging even in the absence of an expropriation action. Despite the legislative failure to provide a procedure to seek redress when property is damaged or taken without proper exercise of eminent domain, this Court has held that a cause of action must arise out of the self-executing nature of the constitutional command to pay just compensation. Chambers, 595 So.2d at 602; Reymond v. State, Through the Department of Highways, 255 La. 425, 231 So.2d 375, 383 (1970). Such a cause of action is referred to as an inverse condemnation, which is defined in Reymond as the "proceeding whereby an owner may seek redress when his property is damaged or taken without the proper exercise of eminent domain."
Id. [Footnotes omitted.]
In State Through Dept. of Transp. & Development v. Chambers Investment Co., 595 So.2d 598 (La.1992), the Supreme Court, acknowledging that the taking and damaging of legal property rights is by nature abstract and conceptual and often incompletely understood, adopted a threeprong analysis to determine whether a claimant is entitled to eminent domain compensation. The Court stated:
Under this analysis, we must first determine if a person's legal right with respect to a thing or an object has been affected. In other words, we must be able to identify a recognized species of private property right that has been affected, regardless of whether causes of action may exist on other theories; otherwise, it cannot be said there has been an exercise of the power of eminent domain. Second, if it is determined that property is involved, we must decide whether the property, either a right or a thing, has been taken or damaged, in a constitutional sense. If property is taken or damaged, one may say that there has been an attempted exercise of the eminent domain power. The final question then is whether the taking or damaging is for a public purpose.
595 So.2d at 603. [Emphasis in original.]
The plaintiffs argue that the DNR's actions in this case constitute a taking or an appropriation pursuant to La. R.S. 13:5111, because this appropriation statute mandates an award of attorney's fees and, crucial to the plaintiffs' claims, establishes a three year prescriptive period for filing suit for compensation for a taking of property. La. R.S. 13:5111 provides:
 5111. Appropriation of property by state, parish, municipality or agencies thereof; attorney, engineering and appraisal fees; prescription
A. A court of Louisiana rendering a judgment for the plaintiff, in a proceeding brought against the state of Louisiana, a parish, or municipality or other political subdivision or an agency of any of them, for compensation for the taking of property by the defendant, other than through an expropriation proceeding, shall determine and award to the plaintiff, as a part of the costs of court, such sum as will, in the opinion of the court, compensate for reasonable attorney fees actually incurred because of such proceeding. Any settlement of such claim, not reduced to judgment, shall include such reasonable attorney, engineering, and appraisal fees as are actually incurred because of such proceeding. Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall prescribe three years from the date of such taking.
B. The rights of the landowner herein fixed are in addition to any other rights he may have under the constitution of *734 Louisiana and existing statutes, and nothing in this part shall impair any constitutional or statutory rights belonging to any person on September 12, 1975.
The term "appropriation," which is the crux of this matter, is not defined in the above statute, nor does it appear in the definitions section of the act. See La. R.S. 13:5102. Unlike La. R.S. 38:301, the appropriation statute that provides for compensation to property owners whose property is "taken, used, damaged, or destroyed" for levee or levee drainage purposes pursuant to Article VI,  42 of the 1974 Louisiana Constitution, La. R.S. 13:5111, by its very terms, applies only to claims for compensation for the taking of property.
The disjunctive language of Article I,  4 that "[p]roperty shall not be taken or damaged by the state ..." implies that the terms "taken" and "damaged" have separate, distinct meanings. [Emphasis added.] Property is considered as "taken" when the public authority acquires the right of ownership or one of its recognized dismemberments. Columbia Gulf Transmission Company v. Hoyt, 252 La. 921, 215 So.2d 114 (1968), noted at 43 Tul. L.R. 714 (1969); Soma Enterprises v. State, through D.O.T.D, 521 So.2d 829, 831 (La. App. 2 Cir.1988); State, DOTD v. Sugarland Ventures, Inc., 476 So.2d 970, 974 (La.App. 1 Cir.1985). Property is considered "damaged" when the action of the State results in the diminution of value of the property. See Hoyt, supra, 215 So.2d at 120; Soma Enterprises, supra.
The Louisiana Supreme Court, in Constance, supra, 626 So.2d at 1156, discussed the liability of a public body in an inverse condemnation action, stating:
The liability of a public body in such case, however, had been limited to "those instances where there is a physical taking or damage to property or a special damage peculiar to the particular property and not general damage sustained by other property similarly located." Reymond, 231 So.2d at 383. In assessing that special damage, it must be determined "whether that damage is not suffered by those in the general neighborhoodÔÇöthat is, whether the damage is peculiar to the individual who complains." Id. at 384.
The Court also acknowledged the trend in opinions toward the increasing acceptance of the possibility of takings without physical invasion, noting, "any substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of the federal and state constitutions." Chambers Investment Co., supra, 595 So.2d at 602. [Emphasis in original.]
An explanation of the terms "eminent domain," "expropriation," and "appropriation" as used in the context of Louisiana's civilian jurisprudence is set forth in Michael G. Dakin & Michael R. Klein, Eminent Domain in Louisiana 2-3 (1970 and Supp.1978), which states:
There are intended lines of differentiation amongst these terms, although it is clear that the lines have not always been respected or understood by Louisiana courts or commentators. All three, to be sure, describe aspects of the power which government has to compel the transfer of existing use or ownership of property. The most inclusive phrase, eminent domain, is a general heading identifying this authority. In common-law jurisdictions, the exercise of this authority is referred to as condemnation. This is not the case in Louisiana. Instead, the great bulk of that which is included in a description of the exercise of the power to compel the transfer of property is properly described *735 as "expropriation." Most of the otherwise unincluded aspects of this exercise of eminent domain authority are subsumed under the Louisiana term "appropriation."
As distinguished from the apparent dual meaning of "appropriation," "expropriation" is properly descriptive only of the authorized use of judicial coercion to compel the transfer of existing property rights conditioned upon the prior payment of just compensation. Conversely, one meaning of the term "appropriation" is the unauthorized use of the force of government or its agents to deprive a current landowner of his property without conformity to the requirements of the Louisiana constitution or the relevant jurisprudence. But, in addition to this epithetical significance, "appropriation" is also properly descriptive of the authorized exercise of property rights vested in the public by virtue of the jurisprudence, an exercise not intrinsically conditioned upon the payment of compensation.
To determine whether the DNR's actions in this case constitute an "appropriation" or "taking" of the plaintiffs' oyster leases as contemplated by La. R.S. 13:5111, one must look to the jurisprudence interpreting a "taking" of property pursuant to Article I,  4 and La. R.S. 13:5111.
In Chambers Investment Co., supra, the State, in connection with the construction of Interstate 49 between Alexandria and Lafayette, expropriated 41.951 acres of land from the middle of a 300-acre tract in Rapides Parish and deposited in the registry of the district court the sum representing the State's estimated compensation to the landowner for the land taken and severance damages to the remainder. Prior to the expropriation, the 300-acre tract had been used as farmland. Sometime after the expropriation, the landowner explored the possibility of developing the remaining land as a residential subdivision, but abandoned the idea after learning the land might lie in the proposed path of Interstate 49. The landowner filed suit for compensation for the land taken and severance damages. The trial court awarded the landowner damages for the past and anticipated delay in developing its land as a result of highway construction on the State's adjacent property, which the appellate court affirmed.[21] The Supreme Court granted writs[22] and held that the landowner had a recognized and constitutionally protected property right to use and enjoy its land by developing it as a residential subdivision, subject to La. C.C. arts. 667 and 668, which imposed limitations on a landowner's right of ownership, including tolerating some inconvenience from the lawful use of a neighbor's land. The Court found that the construction use of the State's adjacent tract did not exceed the inconvenience that the landowner was bound to tolerate. Thus, the Court concluded that any delay the landowner experienced in developing its property did not constitute a taking because its constitutionally protected property right was not taken. 595 So.2d at 606.
The following year, in Constance, supra, the Supreme Court considered whether the landowners' restricted access to their property with accompanying reduction in property value and temporary loss of business income was a compensable taking of property. The plaintiffs in Constance owned a building wherein they operated Cleary Bicycle, Moped & Go-Cart Center, Inc., located on the Interstate 10 Service *736 Road adjacent to the Interstate 10/Clearview Parkway interchange in Metairie. In connection with the construction of a new westbound I-10 exit ramp at Clearview Parkway, the Louisiana Department of Transportation and Development ("DOTD") re-routed the four primary approaches to the intersection of Clearview Parkway and the I-10 Service Road. After completion of the project, two of the four approaches were permanently altered, requiring a more circuitous route to the plaintiffs' bicycle shop and other businesses nearby. The Supreme Court determined that although the landowners' street access was a private property right that had been affected for a public purpose, the landowners presented no evidence of physical damage to the property or excessive or abusive conduct by the DOTD. The Court noted that the barricades, the signs, and the parked equipment, which impeded or interfered with access to plaintiffs' property for a brief period, were precisely the types of disturbances, inconvenience, or even financial loss ordinarily occasioned as a general consequence of such a public improvement. The Court further noted that although the DOTD could have better accommodated the adjacent property owners during construction, its actions never rose to the level of excessive or abusive conduct that neighboring landowners need not tolerate. The Court also found no special damage peculiar to the private landowners' particular property existed as the damage was suffered by those in the general vicinity. Thus, the Court held no compensable taking had occurred. 626 So.2d at 1158.
In Rivet v. State, DOTD, 96-0145 (La.9/5/96), 680 So.2d 1154, the trial court determined that the DOTD had taken a landowner's property, which he intended to develop as a residential subdivision, when it refused to grant him a driveway permit to allow ingress and egress to and from his property onto Airline Highway. The DOTD denied the permit request because of its imminent plan to build the Interstate 310/ Airline Highway interchange near the proposed subdivision. Even though an actual physical taking did not occur, the Louisiana Fifth Circuit Court of Appeal previously determined that the substantial impairment of ingress and egress was special and peculiar to the landowner's property and prevented him from developing it; thus, compensation was due. Rivet v. State, DOTD, 93-369 (La.App. 5 Cir. 3/16/94), 635 So.2d 295, 298. The trial court also concluded that the three-year prescriptive period in La. R.S. 13:5111 began to run from the date of discovery of the takingÔÇöthe date the landowners received DOTD's letter informing them that their application for the driveway permit was denied.
In Naquin v. Dept. of Transportation and Development, 604 So.2d 62 (La.App. 1 Cir.1992), the plaintiffs had leased two contiguous tracts of land for sugar cane production from separate private landowners. During the existence of the lease, the DOTD purchased a 26.42-acre tract in the leased area from the respective landowners for the purpose of constructing a rightof-way needed to straighten a sharp curve in Louisiana Highway 39. The sellers were compensated for their interests in the land and sugar cane crop then growing on the land. The plaintiffs, having received no compensation, filed suit against the DOTD to recover damages for loss of their crops, leasehold rights, and future gross income resulting from the sale of the 26.42 acre tract. The trial court, finding that the DOTD's actions constituted a taking of the plaintiffs' leasehold interests, awarded them damages and attorney's fees. The First Circuit Court of Appeal upheld the attorney's fee award citing La.
*737 R.S. 13:5111 as the standard for such an award. Id. at 69.
Similarly, in Huckabay v. Red River Waterway Commission, 27,113 (La.App. 2 Cir. 10/12/95), 663 So.2d 414, the plaintiffs had leased private property in Red River Parish to use as pastureland in conjunction with their cattle business. Pursuant to the lease, the plaintiffs made improvements to the property, including clearing brush, building fences, fertilizing the land, and planting Bermuda grass. They also repaired the barn, built a corral, and added a water well and pond to the property. During the lease, the landowners granted a right of entry upon the property to the Red River Waterway Commission ("Commission"), a public body, to conduct exploratory work in connection with a proposed lock and dam to be built on the Red River in the vicinity of the property. Sometime later, after the Commission had done extensive damage to the leased land to the plaintiffs' detriment, in lieu of expropriation, it purchased the property from the landowners for construction of the dam. The plaintiffs then filed suit for compensation for the taking of their leasehold rights and damages for loss profits of the cattle business and loss of use of the improvements they had placed on the land. The Second Circuit Court of Appeal upheld the trial court's finding that the Commission's actions constituted a taking of the plaintiffs' leasehold rights (which they had acquired from the private landowner prior to the landowner's sale of the property to the Commission) and awarded them compensation and attorney's fees pursuant La. R.S. 13:5111. Id. at 424.
The Second Circuit upheld another trial court's finding that a taking occurred in Simmons v. Board of Commissioners of the Bossier Levee District, 624 So.2d 935 (La.App. 2 Cir.1993). In that case, the plaintiffs owned 17 contiguous residential lots within two adjoining subdivisions located in Bossier City. The plaintiffs' lots fronted Hickory Ridge Drive and were bounded in the rear by Flat River and Benoit Bayou, separate bodies of water that formed a single stream behind the plaintiffs' property. The river and bayou converged about 700 feet from the southernmost line of the plaintiffs' property. The lots sloped gradually toward the water and the rear of each lot was covered with trees that blocked the plaintiffs' view of the opposite bank, secluding the area. The subdivision plats disclosed that the rear boundary of each lot was the centerline of the stream with a 100-foot servitude across the rear of the lots in favor of the levee district. As part of a project to improve drainage in other parts of Bossier City, the Bossier Levee District, under the State's supervision began dredging the river and bayou. Neither the State nor the levee district took soil samples to determine the characteristics of the soil prior to dredging. Shortly after the dredging commenced, the river's bank began to fail. As a result, the ground near the river cracked and dropped off, leaving large crevices across the rear of the plaintiffs' lots. The number of trees lost ranged from 25 to 150 per lot. In addition, the plaintiffs sustained substantial structural damages to their homes, including cracked slabs, windows, walls, fireplaces, and patios, and damage to other structures such as fences, swimming pools, oxidation ponds, and septic systems. An investigation by the U.S. Department of Agriculture Soil Conservation Service determined the dredging operation caused the stream's bank failure because the soil, called Roebuck or "buckshot" clay, was known to crack and slide when stabilizing pressure was removed from the soil mass during excavation, particularly where the soil was exposed to water.
*738 In a suit against the State and levee district, the State stipulated liability under Article I,  4 and La. C.C. art. 667 (strict liability for damage to neighboring property.) The levee board stipulated only to article 667 strict liability. The trial court determined that the land and trees actually lost when the canal's banks failed were "taken" in the constitutional sense, awarding the plaintiffs compensation and, pursuant to La. R.S. 13:5111, attorney's fees. In upholding the trial court's conclusion, the Second Circuit reasoned that even though the plaintiffs were not divested of title to their land, they had incurred a substantial interference with the free use and enjoyment of their property. Id. at 951.
The plaintiffs in the instant case claim that an appropriation or taking of their property occurred when the State, through the DNR, diverted fresh water by the Caernarvon Freshwater Diversion project from the Mississippi River onto their state-granted oyster leases within Breton Basin. The fresh water, they contend, destroyed their then existing oyster crops and permanently altered the water's salinity levels, rendering their leases unsuitable for oyster growth. A review of the aforementioned appropriation and taking cases indicates that none is exactly on point with the case before us. Notwithstanding this fact, I, nevertheless, find that plaintiffs' claims do not constitute a taking pursuant to the Louisiana Constitution for several reasons.
In Simmons, the extensive physical destruction and permanent loss of the private landowners' land and trees by the levee district precluded the landowners from ever enjoying their property. Also, the appropriating authorities in Huckabay and Naquin physically invaded, damaged, and used the privately leased properties for public purposes, preventing the lessees from using the land for the purposes set forth in their respective leases.
In the case at bar, however, nothing in the record indicates that the DNR actually invaded or physically disturbed or damaged the water bottoms that were leased by the plaintiffs. It is also significant that the Caernarvon Freshwater Diversion Structure was not constructed on or adjacent to the plaintiffs' leased water bottoms. Although the plaintiffs allege that the freshwater diversion deposited huge amounts of sediment onto their leases, the scientific evidence in the record does not support this claim.
It was uncontroverted that the Caernarvon structure, a "control" structure, was incapable of drawing large pieces of sediment from the Mississippi River. The diversion's flow deposited any sizable pieces of sediment in Big Mar, the sediment trap near the diversion structure. Even though approximately one-half inch of sediment per year had been deposited in testing stations very near the diversion structure, no significant increase in sediment was found in testing stations in the regions of the basin where the oyster leases were located. The "truck loads of sediment," as described by the plaintiffs, were deposited and distributed across hundreds of thousands of acres of water bottoms. In addition, none of the oyster leases surveyed by either the plaintiffs' or defense experts disclosed any areas of mass buried shells to indicate sediment had covered productive leases.
Moreover, I cannot say that the DNR's actions substantially interfered with the oyster lessees' exclusive use of the leased water bottoms. Unlike in Rivet, where the DOTD's refusal to grant a necessary driveway permit to the landowner permanently deprived him of his right to develop his property as a residential subdivision, the DNR's diverting of fresh *739 water into the Breton Basin did not divest the oyster lessees of their right to enjoy the exclusive use of the leased water bottoms. The class representatives testified that they continued to exercise their right to claim damages from oil and gas interests for drilling, surveying, dredging, and other exploration activities conducted on their leases following the diversion, even though the leases were unproductive for oysters. Several of the oyster lessees also filed claims with the federal government for the damages to their oyster leases as result Hurricane Andrew.
The plaintiffs also contend that the fresh water diversion and resultant eurasian water milfoil have rendered their leased water bottoms incapable of supporting oyster populations. The evidence in the record supports the plaintiffs' claims that substantial oyster mortality occurred on their leased oyster beds located within the Caernarvon impact area as a result of the freshwater diversion. The evidence, however, also reflects that oyster production resumed on many private leases when the DNR minimized the diversion flow.
Furthermore, the evidence reflects that the adverse impact of the freshwater diversion in the Breton Basin was not limited to the plaintiffs' oyster leases. It was undisputed at trial that the commercial and recreational fishermen, commercial shrimpers, and coastal property owners, too, were adversely affected by the fresh water. The nutrient laden fresh water fostered vegetation growth along the entire coastal region in the Breton Basin. The increased vegetation led to an explosion of nutria and other wildlife in the estuary, whose excretions exacerbated the fecal coliform counts, posing a health danger to all wildlife and fisheries in the area. Also, the unrefuted scientific evidence indicates that, in addition to the Caernarvon freshwater diversion, other environmental factors contributed to the growth of eurasian water milfoil, including the amount of rainfall and high temperatures. Much like the damages sustained in Constance, supra, the negative effects of the Caernarvon structure's freshwater diversion were not peculiar to the plaintiffs' oyster leases.
While Huckabay and Naquin both involve the taking of a leasehold interest, they are distinguishable from the instant matter because in those cases the leased properties, which were clearly appropriated (purchased), were owned by a private party other than the appropriating public entity, i.e., the state, a parish, or municipality, or other political subdivision or agency.
In this case, the leasehold rights, which the plaintiffs contend have been appropriated, are the leases of state-owned water bottoms. See La. R.S. 9:1101 (quoted infra). Because perfect ownership of the water bottoms is vested in the State, the State, by leasing the water bottoms, exercised its right to utilize the usufruct portion of the right of perfect ownership. The naked ownership of the water bottoms, however, was never transferred or assigned to the oyster lessees. During the term of the lease, the State retained the right to do anything it so desired to its naked ownership interest in the water bottoms, but it was responsible for the damages it caused to the leaseholder to the extent that it impaired the leaseholder's right to use the property leased as determined by law and the provisions of the lease agreement.
An oyster lease merely allows the lessee the exclusive use of the water bottom leased. In that regard, the oyster lease is not materially different from any other lease. It is a synallagmatic contract by which the State gives to another (the lessee) the enjoyment of a thing (a specific *740 area of water bottom, but not the water overlaying the water bottom) for a fixed price. Cf., La. C.C. arts. 2669 and 2670. It can be terminated by the State for the lessee's failure to pay the rent or the failure of the lessee to fulfill the obligations specified in the lease. It grants to the lessee the uncertain hope that he or she will be able to raise a crop of oysters upon the water bottom. But the lessee is not entitled to an abatement of rent if no crop of oysters is produced. Cf., La. C.C. arts. 2743 and 2744. It is for a specific term and can be extended under certain conditions as provided by law.
The term "appropriation," as used in Louisiana, contemplates the permanent or near permanent taking[23] of another person's property by the State (or its political subdivision) such that the owner is prohibited from using his property freely as contemplated by La. Const. Art. I,  4. In other words, the State cannot appropriate or inversely condemn that which it already owns. This interpretation is reinforced by the fact that while both the State (or its political subdivisions) and a private entity, when authorized by law, may expropriate property pursuant to La. Const. Art. I,  4, only the State (or its political subdivisions) may appropriate property. No constitutional provision, statute, or jurisprudence allows for the appropriation of property by a private entity.
The State can appropriate the leasehold of a person holding his lease from a private person, such as in the Huckabay and Naquin cases, because the State is permanently taking the leasehold for the remaining term of the lease. Although an oyster lessee holds his lease for a specific term with the first right to extend the lease for additional periods of time, nevertheless, the State by enacting legislation can terminate that first right effective upon future renewals. In that sense, an oyster lessee does not hold his lease in perpetuity. Therefore, no permanent taking of the plaintiffs' leaseholds occurred.
The State, by creating and operating the Caernarvon structure, did not acquire, expropriate,[24] or take the water bottoms that it leased to the plaintiffs. Nor did it acquire from the plaintiffs the exclusive use of the leased water bottoms. If anything, the State in this case merely damaged its own property (the water bottoms) and the leaseholds of the plaintiffs.
The evidence before us demonstrates that oyster farming, by its very nature, is highly speculative and subject to a multitude of environmental factors that affect oyster production: for example, the water's salinity level is one; the amount of sediment in the water is another; the weather is a third.
La. R.S. 9:1101 relative to ownership of the waters and beds of bayous, rivers, lagoons, lakes and bays, provides, in part:
The waters of and in all bayous, rivers, streams, lagoons, lakes and bays, and the beds thereof, not under the direct ownership of any person on August 12, 1910, are declared to be the property of the state. There shall never be any charge assessed against any person for the use of the waters of the state *741 for municipal, industrial, agricultural or domestic purposes.
I note that this statute implies two things material to this case. First, water and water bottoms are two separate and distinct things. Second, the State cannot charge for water used for agricultural purposes, such as oyster farming.
As previously cited, La. R.S. 56:425 authorized the DWF to lease only stateowned water bottoms and natural reefs on the water bottoms of Louisiana. Because the granting of the plaintiffs' oyster leases did not include the lease of the stateowned waters covering the leased water bottoms, the plaintiffs had absolutely no constitutionally protected property interest in the water itself. If the DWF had warranted the condition and/or salinity levels of water covering the water bottoms when it granted the oyster leases, then perhaps that would not be the case. But the DWF made no such guarantee.
After thoroughly reviewing the entire record in this matter, in light of the jurisprudence interpreting the taking of property pursuant to Art. I,  4 of the Louisiana Constitution and La. R.S. 13:5111, in the absence of evidence to indicate physical damage to, physical destruction of, physical invasion on, or special damage peculiar to the plaintiffs' leased water bottoms by the DNR as a result of the operation of the Caernarvon Freshwater Diversion Structure, I cannot say and do not find that the damages sustained by the plaintiffs to their oyster leases constitute a "taking" or an "appropriation" of property pursuant to Art. I,  4. Thus, La. R.S. 13:5111 is not applicable to the case at hand.
In view of my conclusion that the plaintiffs' damages as a result of the freshwater diversion are not a compensable taking of property within the meaning of Art. I,  4, I must now consider whether their delictual claims are prescribed.

Prescription under La. R.S. 56:423 and La. R.S. 9:5624
It is well settled in Louisiana law that when conflicting statutes are applicable, the one more specifically directed to the matter at issue trumps the more general statute. Estate of Patout v. City of New Iberia, 98-0961 (La.7/7/99), 738 So.2d 544, 549.
The one-year general prescriptive period for delictual actions is found in La. C.C. art. 3492. Similarly, La. R.S. 56:423 allows an oyster lessee to bring an action for damages for the wrongful or negligent injury or damage to the beds or grounds under lease by him within one year of the occurrence of the wrongful or negligent act, or within one year of the date of discovery of such act, whichever is later.[25] On the other hand, La. R.S. 9:5624, relative to actions for damages to private property for public purposes, provides:
When private property is damaged for public purposes any and all actions for such damages are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works.
The purpose of the statute is to limit the exposure of the State and its political subdivisions to liability in connection with a public work to a reasonable period of time. Lyman v. Town of Sunset, 500 So.2d 390 (La.1987). One understands this statute to require a person to assert his or her *742 claim for damages (past and future) caused by a public work within two years of the completion of the public works project and, if not so asserted within that two year period, all claims directly related to that public works project, even if incurred after the two year period, are barred.
Both La. R.S. 56:423 and La. R.S. 9:5624 are more specific to the matter at hand than La. C.C. art. 3492. However, as between La. R.S. 56:423 and La. R.S. 9:5624, La. R.S. 9:5624 is more specific to the issue before us because the plaintiffs assert a claim for damages to their leaseholds as the result of the operation of a public work (the Caernarvon Freshwater Diversion Structure) rather than a private work or private action, in which case La. R.S. 56:423 would be applicable.[26] Here, it is undisputed that the damages sustained by the plaintiffs to their leasehold interests, in addition to the loss of their oyster crops and loss of anticipated income from those oysters, were a necessary consequence of the public work and incurred for a public purpose. The construction and operation of the Caernarvon Freshwater Diversion Structure were mandated by the U.S. Congress and the State of Louisiana for the dual purposes of restoring the State's coast for hurricane and flood protection and enhancing oyster production on the State's public seed grounds.
Applying the two-year prescriptive period in La. R.S. 9:5624 to this case, the plaintiffs' claims for damages to their oyster leases have prescribed. The Caernarvon Freshwater Diversion Structure was completed in August 1991 and became operational in September 1991. Thus, pursuant to La. R.S. 9:5624, the plaintiffs would have had to file their claim for damages no later than September 1993, which was two years from the date the project went online. The plaintiffs' suit filed on 29 March 1994 was prescribed when filed. Because this conclusion disposes of the plaintiffs' case, I would not address the remaining assignments of error.
Conclusion
In summary, I find that La. R.S. 13:5111 is not applicable to this case. I further find that the plaintiffs are lessees of water bottoms for a fixed term of years, but with the first right to renew their leases. The State is the lessor and owner of the water bottoms, an immovable, which the plaintiffs lease.
Appropriation contemplates the permanent or near permanent taking of a person's property by the State such that the owner is prohibited from using his property freely as contemplated by La. Const. Art. I,  4. The State cannot appropriate or inversely condemn that which it already owns, i.e., the water bottoms, because it already owns them by virtue of La. R.S. 9:1101. The State can appropriate the leasehold of a person holding his or her lease from a private person because the State is permanently taking the leasehold for the remaining term of the lease. Although the plaintiffs hold their leases for a specific term with the first right to extend the leases for additional periods of time, nevertheless the State can by an enacted law terminate that first right effective upon future renewals. The plaintiffs do not hold their leases in perpetuity. Therefore, no permanent taking of the plaintiffs' leaseholds occurred and no appropriation took place.
*743 During the term of a lease, the State retains the right to do anything it so desires to its naked ownership interest in the water bottom, but is responsible for the damages it causes to the leaseholder to the extent that it impairs the leaseholder's right to use the property leased as determined by law and the provisions of the lease. A claim against the State for damages, such as that contemplated by La. C.C. art. 2315, to a water bottom caused by the State must be asserted within one year under La. R.S. 56:423, or, if applicable, within two years under La. R.S. 9:5624. In the case at bar, the damages, if any, caused by the State to the plaintiffs' leaseholds are article 2315 damages. The plaintiffs' claims had to be asserted within two years from the date that the Caernarvon Freshwater Diversion Structure became operational; in the case at bar, the period began in September 1991.
Accordingly, for the above reasons, I would reverse the judgment of the trial court and render judgment dismissing the plaintiffs' case.
NOTES
[1] The general background of the CFDS and the effect of its operation upon the plaintiffs' oyster leases is discussed in detail in Avenal v. United States, 100 F.3d 933 (1996).
[2] The plaintiffs also contend, and presented evidence, that some oyster leases became unsuitable for oysters because of the creation of marsh (which is a purpose of CFDS) and the deposit of sediment. The plaintiffs also contend, and presented evidence, that CFDS led to closures of oyster leases due to fecal coliform. Fecal coliform lives longer in fresher water. Also, increases in animal life in newly-created marshland cause increases in fecal coliform. Additionally, the plaintiffs contend, and presented evidence, that the increased freshwater flow of CFDS caused the growth of eurasian milfoil, an aquatic plant, which made their oyster leases inaccessible by boat.
[3] The State cites Inabnet v. Exxon Corp., 93-0681 (La.9/6/94), 642 So.2d 1243. However, Inabnet was a tort case between private parties rather than a public takings case implicating Article I, Section 4 of the Louisiana Constitution. In some cases, the compensation constitutionally required in a takings case is greater than would be the damages awarded in a tort case with the same facts. See Packard's Western Store, Inc. v. State, Dept. of Transp. and Development, 618 So.2d 1166 (La. App. 2 Cir. 5/5/93), writ denied, 629 So.2d 345 (La.1993).
[4] The jury awarded one of the class representative plaintiffs, Albert J. Avenal, only $1,000 per acre of oyster leases taken. Perhaps the jury treated Mr. Avenal differently because he acquired some (but by no means all) of his leases just as the present action was being filed. However, there is no evidence that Mr. Avenal, a well-established oyster fisherman, who had entered into prior such oyster lease transactions, was in any way in bad faith. Thus, there was no proper basis for Mr. Avenal to be treated any differently than the other plaintiffs. Consequently, we will modify the judgment so that Mr. Avenal receives the same compensation per acre as the other plaintiffs.
[1] "Cultch" is a hard material made up of crushed shells and limestone that is used to build a substrate (foundation) on muddy water bottoms of a lease. Cultch is essential to oyster harvesting because it creates a reef for spat (seed oysters) to attach onto and to grow.
[1] The Caernarvon Freshwater Diversion Structure is a multi-purpose structure consisting of five concrete culverts each measuring 15 feet by 15 feet with metal gates that are raised and lowered as needed. The structure connects the Mississippi River to the marshes of Breton Basin by a canal. When the gates are raised, fresh water and suspended sediment from the river flow through the canal into the basin.
[2] In addition to the evidence in the record before us, the factual and procedural history is taken from the decisions in Avenal v. United States, 100 F.3d 933 (Fed.Cir.1996); Avenal v. United States, 33 Fed. CI. 778 (1995); and Avenal v. State, 99-0127 (La.App. 4 Cir. 3/15/00), 757 So.2d 1, cert. denied, Louisiana Dept. of Natural Resources v. Avenal, 531 U.S. 1012, 121 S.Ct. 568, 148 L.Ed.2d 486 (2000).
[3] Breton Sound is an estuarine basin consisting of approximately 676,000 acres, of which 492,000 acres are water bottoms.
[4] Earlier, the plaintiffs moved for class certification, which motion the trial court granted in August 1996. This court's judgment upholding the class certification became final when the Louisiana Supreme Court denied the State's writ application in Avenal v. State, Dept. of Nat. Resources, 97-2747 (La. 1/16/98), 706 So.2d 979.
[5] Avenal v. State, unpub., 99-0317 (La.App. 4 Cir. 12/15/00).
[6] This issue is discussed further in a footnote infra.
[7] The closure line is the boundary designated by the DHH that delineates safe areas, where oyster harvesting may take place, from unsafe areas where it is prohibited. The line, based on the water's historical fecal coliform (fecal bacteria) content, fluctuates during the year. During winter months, the northwest winds push the salt water in the estuary out toward the Gulf of Mexico, while in the summer, south winds and high tides from the gulf push the salt water inland. Generally, fresh water attracts nutria, other animals, and live organisms, which deposit waste, producing higher fecal bacteria populations.
[8] Pursuant to La. R.S. 56:421, the Louisiana Legislature established the Oyster Task Force to study and monitor the molluscan industry and to make recommendations for the maximization of benefit from that industry for the state of Louisiana and its citizens.
[9] Pursuant to La. R.S. 56:700.10, et seq. (1995), the Louisiana Legislature formed the OLDEB as an arm of the DNR to arbitrate conflicts between mineral owners and oyster leaseholders to effect an equitable solution to the problem which will result in fair and predictable treatment to the oil and gas industry while assuring the oyster fishermen actual compensation for damages to their oyster beds due to mineral activities. The OLDEB is authorized to promulgate rules and regulations to determine the method of establishing a uniform system of compensation for actual damages caused to the beds of leaseholders by oil and gas activity based on biological test data. As to the duties of the OLDEB, La. R.S. 56:700.13 provides in part:

C. The board shall develop a list of qualified biologists to provide biological test data in determining the quality, condition, and value of oyster beds and grounds. The secretary, in conjunction with the board, shall develop a list of qualifications for these biologists. When an owner of an oil and gas activity is required by the provisions of R.S. 56:700.12(3) to perform a biological survey under this Part, he shall be required to choose a biologist from the list of qualified biologists provided by the board. The board shall provide the owner of the oil and gas activity a list of three names from this list, and the owner of the oil and gas activity may choose any of the names so provided to conduct the survey. The secretary, in conjunction with the board, shall adopt rules providing for a regular rotation of this list so that each of the listed qualified biologists is available for selection on a regular basis.
D. The board members shall evaluate the information regarding damage to the beds and make the final determination in awarding damages to claimants. The secretary, upon receiving this determination of damages, may reject the damage award and send the matter back to the board. The board may then either revise the damage award or, by a two-thirds vote, affirm the original damage determination. If the board fails to either revise the damage award or affirm the original damage determination, the arbitration process provided in this Part shall conclude without a final determination of damages.
E. The determination of damages by the board shall be based on the values shown in the biological survey and shall reflect true and actual damages.
[10] Pursuant to La. R.S. 56:432.1, the DNR developed the relocation program to reduce and offset the potential adverse impact of the Davis Pond Freshwater Diversion Structure, whose projected operation date was June 2002.
[11] Oyster spat consists of seed oysters.
[12] Side scan sonar is the application of hydroacoustic technology to delineate or "map" subtidal oyster reefs from adjacent water bottoms. Hydroacoustic surveys allow scientists to investigate in detail a water bottom's topographic features and textural patterns, which provide evidence of the estuarine sedimentation processes operating on an oyster reef. The surveys also identify evidence of damage to oyster reefs associated with activities such as marine transportation, seismic surveys, oil and gas exploration, and dredging. Generally, side scan sonar is used in conjunction with ground truthing (poling) for the most accurate quantification of reef on an oyster lease.
[13] The United States Supreme Court established criteria for the admissibility of expert testimony in general and expert scientific testimony in particular in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Louisiana Supreme Court adopted the standards set forth in Daubert in State v. Foret, 628 So.2d 1116 (La.1993).
[14] The DNR proffered the Daubert hearing evidence at the close of trial and, in this appeal, assigns as error the trial court's granting of the plaintiffs' motion to exclude the side scan sonar evidence. The proffered evidence and other evidence in the record discloses that the application of the cultch currency matrix for the purposes of estimating damages to an oyster reef entails the use of both side scan sonar and ground truthing. Both side scan sonar and ground truthing are generally accepted in the scientific community in estimating aquatic habitats. Although both methodologies have a rate of error, when used in conjunction with each other, the methodologies have a 90% accuracy rate. Insofar as the trial court allowed the plaintiffs to admit evidence of the application of the cultch currency matrix by the OLDEB and ground truthing by Brodtmann to prove the amount of their damages, it also should have allowed into evidence the DNR's side scan sonar surveys. I note that by granting the plaintiffs' motion in limine to exclude the side scan sonar evidence, the trial court erred.
[15] As other evidence in this case demonstrates, Secretary Caldwell was stating that the values were only relevant to evaluation of damages to oyster leases caused by oil and gas industry activity.
[16] In 1992, the U.S. Food and Drug Administration considered imposing a moratorium on oyster harvesting from Louisiana water bottoms after the DHH reported finding the potentially fatal vibrio vulnificus bacteria among oyster crops. Prior to taking action, the FDA retained an environmental firm from North Carolina to study and analyze the potential impact of such a closure. In connection with this study, the firm determined the average market value of an oyster lease at the time using two methods: (1) discounting profits over time; and, (2) asking oyster leaseholders the value of their leases.
[17] DNR requested that subpoenas be issued to the seafood dealers throughout Plaquemines and St. Bernard Parishes, who kept records of actual oyster production from oyster leases located within the Breton Basin. It argued that the subpoenas were necessary because the plaintiffs failed to produce their own production records during discovery. The plaintiffs filed a motion to quash the subpoenas, which the trial court granted on 5 November 1998. This Court upheld the trial court's ruling in Avenal v. State, unpub., 99-0319 (La.App. 4 Cir. 12/15/00). Nevertheless, shortly before trial, the trial court ordered Rodney Fox to produce his business records.
[18] Avenal v. State, unpub., 01-0542 (La.App. 4 Cir. 5/22/01).
[19] The plaintiffs argued to the trial court that the hold harmless and indemnity clauses were unilaterally inserted by the DWF into their oyster lease agreements and are invalid in light of the decision in Jurisich v. Jenkins, 99-0076 (La. 10/19/99), 749 So.2d 597. In Jurisich, the Louisiana Supreme Court addressed the scope of authority granted to the secretary for the DWF with respect to the renewal of oyster leases as provided by La. R.S. 56:428. At issue was whether the secretary could refuse to renew oyster leases unless the oyster lessees agreed to the inclusion of an onerous condition, which was not part of their original lease agreements. Specifically, the lease renewals were contingent upon the inclusion of a clause which made the oyster leases "subservient to navigation, maintenance of navigation, and all normal, usual and permissible mineral and oil field activity which had been sanctioned by the State through a prior existing lease, permit, or contract." The Court held that the discretion of the secretary to renew an oyster lease is limited by a determination of the lease's capability of supporting oyster populations as provided in La. R.S. 56:428 A, and to allow the navigation and oil field activity clause as a condition of lease renewal would have been an impermissible expansion of the secretary's authority. Id. at p. 7, 749 So.2d at 601. The Court noted that the legislature specifically provided the law the secretary must apply in oyster lease renewals, and for expansion of this authority, the secretary must seek legislative authority to do so. Id. Interestingly, the Supreme Court limited its review to consideration of the Navigation and Oil Field Activity clause, although the Jurisich plaintiffs, like the plaintiffs in the case at bar, also complained of the Coastal Wetlands Restoration Advisory clause and the Allocation of Risk and Liability, and Indemnification clause. Notably, too, the Jurisich decision applied only to the renewal of existing oyster leases and not to newly acquired ones.

In response to the Supreme Court's decision in Jurisich, the legislature, by Acts 2000, 1st Ex.Sess., No. 107,  1, enacted La. R.S. 56:427.1, which provides:
A. Notwithstanding any other law to the contrary, the state of Louisiana, its political subdivisions, and its agents or employees shall be held free and harmless from any claims for loss or damages to rights arising under any oyster lease, renewal, or extension granted to any individual or other entity for any purpose from diversions of fresh water or sediment, depositing of dredged or other materials, or any other actions taken for the purpose of management, preservation, enhancement, creation, or restoration of coastal wetlands and from impacts associated with projects authorized and defined under the state's Coastal Wetlands Conservation and Restoration Plan.
B. All departments, agencies, boards, or commissions of the state of Louisiana and its political subdivisions shall include language which shall hold the state and its political subdivisions harmless for the purposes set out in this Section in all oyster leases, renewals, or extensions granted to any individual or other entity after July 1, 1995.
Section 2 of Acts 2000, 1st Ex.Sess., No. 107 provided:
This Act is intended to be remedial in nature and delineates legislative intent and shall be retroactive as it applies to any oyster leases, renewals, or extensions granted to any individual or other entity on state water bottoms whose rights may be affected by coastal restoration projects.
Thus, to the extent that the above hold harmless clause was included in any oyster lease, renewal, or extension granted to a plaintiff after July 1, 1995, it may affect the respective plaintiff's claim. Nevertheless, in view of the discussion herein, I would decline to address the merits of this issue at this time for I would decide this case on other grounds.
[20] The law of the case principle recognizes (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case. Reasons assigned for the application of the policy are: the avoidance of indefinite re-litigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency and essential fairness to both sides, of affording a single opportunity for the argument and decision of the matter at issue. Petition of Sewerage and Water Bd. of New Orleans, 278 So.2d 81 (La. 1973).
[21] 576 So.2d 1174 (La.App. 3 Cir.1991).
[22] 584 So.2d 1144 (La.1991).
[23] A near permanent taking is one in which the taking is for an indefinite period of time, but contemplated at the time of the taking to last in perpetuity.
[24] The plaintiffs in the instant case do not allege an expropriation by the State of their leases, although theoretically the State could expropriate the plaintiffs' leases by filing suit and compensating the plaintiffs for their loss; if an expropriation took place, however, the plaintiffs' leases would end. La. C.C. art. 2697.
[25] Again I note that the statute applies to water bottoms, not to the water overlying the water bottoms.
[26] If I were to find that the one-year prescriptive period in La. R.S. 56:423 applicable to this case, then, conceivably, in the future each time the DNR operates Caernarvon to discharge fresh water into the basin which damages the oyster crops and leases, the leaseholders could assert a cause of action against the State for their damages, provided the hold harmless and indemnity clauses in the lease agreements are invalid.